DANIEL F. MAHONEY, trustee, [1] & another [2] vs. CITY
OF CHELSEA.

Suffolk.   April 4, 1985. — May 21, 1985.

Present: GREANEY, C.J., ROSE, & GRANT, JJ.

*Zoning*, Commercial dock, Wholesale business storage and distribution
area. *Words*, "Dock."

Salt importing operations conducted by a company in Chelsea constituted
a commercial dock, rather than a wholesale business and storage facility
for purposes of the Chelsea zoning ordinance, where the salt was brought
to the company's dock in large ocean-going cargo vessels, unloaded by
crawler cranes, and moved further back on the site for storage until it
was delivered to customers. [94-96]

CIVIL ACTION commenced in the Land Court Department
on November 2, 1982.

The case was heard by *Marilyn M. Sullivan*, J.

*Eric W. Wodlinger* for the defendant.

*Robert E. McDonnell* for Eastern Minerals, Inc.

*Andre R. Sigourney* for Daniel F. Mahoney.

GREANEY, C.J. This is the city's appeal from a judgment
of the Land Court[3] which determined that the proposed salt
importing operations of Eastern Minerals, Inc. (Eastern), on
land leased from S.M.P. Trust (S.M.P.) on the waterfront in
Chelsea, will constitute a commercial dock, a permitted use
under the Chelsea zoning ordinance. The city argues that the
Land Court judge erred by not concluding that Eastern's proposed

---

[1] The plaintiff Mahoney controls S.M.P. Trust.

[2] Eastern Minerals, Inc.

[3] The plaintiffs' action was brought in the Land Court pursuant to G. L.
c. 185, § 1 (*j½*), and G. L. c. 240, § 14A. See *Banquer Realty Co.* v.
*Acting Bldg. Commr. of Boston*, 389 Mass. 565, 569-571 (1983).

operations would constitute a wholesale storage and distribution business rather than a commercial dock. We affirm the judgment.

We summarize the facts found by the Land Court judge with some supplementation from the record.[4] The land involved is owned by S.M.P. and consists of about four acres bordered on the west and north by Pearl and Marginal Streets in Chelsea. The entire south side of the property is on the bank of Chelsea Creek, a body of water which regularly carries large ocean-going vessels to and from a variety of facilities along its sides. Few pleasure craft can be found on the creek's waters, and there are no parks on its shores.

This waterfront property is situated in the city's Industrial Waterfront District, the least restrictive of the eleven use zones created by the city's zoning ordinance.[5] The district is generally old and unattractive and is composed largely of oil tank farms, warehouses, junkyards, and a shipyard. Abutting the district is an industrial district which contains a junkyard, a truck sales office, a fruit and produce warehouse and land owned by the Quincy and Sun Oil Companies. The banks of the creek in East Boston across from the site are lined with oil tank farms and a salvage yard. Presently, the property is mostly bare except for truck scales, some concrete blocks, and a hard-top surface. A pier and bulkhead extend the site into the waters of Chelsea Creek. The site is surrounded by a fence filled with a green cloth barrier. A row of small trees is planted along the fence.

S.M.P. has leased the property to Eastern since 1982.[6] Eastern, for some time, has been in the business of importing and selling bulk salt. Eastern had previously occupied the site from 1956 to 1968 in connection with its salt importation and sale

---

[4] The judge's findings of fact are all supported by the evidence at the trial. The judge took a view of the property and the surrounding area.

[5] Permitted uses in the Industrial Waterfront District include, among other activities, parking lots, commercial docks, wholesale businesses and enclosed storage, manufacturing companies, and enclosed junkyards.

[6] The plaintiff Daniel F. Mahoney is also Eastern's principal officer.

business prior to S.M.P.'s acquisition of title. During that period, ocean-going bulk cargo vessels carrying up to 12,000 metric tons of salt would enter the Chelsea Creek and tie up at Eastern's dock on the waterfront side of the site. Crawler cranes with jib booms approximately eighty or ninety feet in length would drop clamshell buckets into the ships' holds, scoop up the cargo of bulk salt and discharge it onto the shore. Front-end loaders would then move the salt further back on the site and arrange it in conical piles. When called for by a customer, the salt would be loaded onto trucks, weighed over a truck scale, and delivered. There was testimony that it is customary in this type of business to store shipload quantities of salt delivered by ocean vessels outside at dockside prior to distributing it to users.

Eastern's major customers are the Commonwealth of Massachusetts and various Massachusetts municipalities which receive the bulk salt, stockpile it in large storage depots and use it for winter road clearing operations. Eastern also supplies some industrial users with salt. Eastern operates throughout the year, although its busiest time occurs between October and March with the advent and continuation of winter weather. As might be expected, most of the ship traffic to the site takes place in the fall. By 1968, after which Eastern decreased its operations at the site, its importation of salt had reached an annual level of approximately 80,000 metric tons.

After 1968, Eastern moved a large part of its operations to other sites, first in South Boston, and later in Portsmouth, New Hampshire. In 1980, however, Eastern decided to reoccupy the Chelsea site. It planned to use the site in essentially the same way as it had before, with the exception that larger cargo vessels would dock and unload a greater tonnage of salt.[7]

During its occupation of the site from 1956 through 1968, Eastern's operations were never subjected to any enforcement

---

[7] The increase in the arrival of salt cargos corresponded with a greater demand for salt and the introduction into sea commerce of larger capacity cargo vessels. In 1983, Eastern unloaded salt from eight 10,000 metric ton vessels, three 25,000 metric ton vessels, and three 35,000 metric ton vessels and sold between 160,000 and 180,000 metric tons of salt.

action under the zoning ordinance then in effect in Chelsea. In 1980, when Eastern reoccupied the site, it applied, under the then prevailing zoning ordinance, to the building inspector and city officials for permits to occupy and repair the dock and for the unloading and loading of cargo vessels and barges. The permits were denied on the basis that Eastern's proposed operations did not constitute a permitted use under the Chelsea zoning ordinance. This lawsuit followed to test the application of the zoning ordinance to the proposed use.

1. The principal question is whether the use contemplated by Eastern for its waterfront site should properly be characterized under the zoning ordinance as a commercial dock (as the plaintiffs contend) or as a wholesale business storage and distribution area (as the city contends). Both uses are permitted in an Industrial Waterfront District under §§ 4.1.3(18) and 4.1.4, respectively, of the ordinance.[8] However, if the use is characterized as a wholesale business storage and distribution area, the zoning ordinance requires that the conical piles of salt off-loaded from the cargo vessels, and any equipment used in the business, be completely enclosed.[9]

The answer to the question lies in the meaning to be given to the term "commercial dock." The zoning ordinance contains no definition of the term. The problem was considered at trial as calling for the ascription of a common and approved usage to the term commercial dock as it is used in the context of the zoning ordinance. That approach was proper. See *Needham* v. *Winslow Nurseries, Inc.*, 330 Mass. 95, 99 (1953); *Salah*

---

[8] The city originally argued that a commercial dock was not a permitted principal use under the ordinance but was allowed only as accessory to some other permitted use. The Land Court judge rejected the argument, finding that the city's interpretation of the ordinance's use table was based solely on a typesetting error contained in one of the earlier printed (and unofficial) editions of the zoning ordinance. The city wisely has not pursued the issue, and its counsel conceded at oral argument on the appeal that a commercial dock is a permitted principal use in the Industrial Waterfront District.

[9] Section 4.1.4(1) (a) of the ordinance approves "Wholesale business and storage provided that: (a) All storage of materials and equipment is completely enclosed in a building. . . ."

v. *Board of Appeals of Canton*, 2 Mass. App. Ct. 488, 492 (1974), and cases cited.

At the trial expert witnesses for both sides[10] were in essential agreement that a commercial dock consists of three major constituent parts. First, the existence of deepwater, which makes the docking of ocean-going cargo vessels possible. Second, the presence of a stringpiece, immediately adjacent to the deepwater, at which an arriving cargo vessel can be secured and on which is contained off-loading equipment such as mobile, crawler or container cranes. Third, a storage area to which the cargo can be efficiently moved from the stringpiece and where it can be held until it is carried away.[11]

---

[10] The plaintiff's expert witness was the principal officer of a stevedoring company which had engaged for sometime in the loading and unloading of deep draft bulk container vessels at various Boston ports. The city's expert witness was the terminal manager for the Massachusetts Port Authority at the Moran Container Facility in Charlestown.

[11] The definitions given by the experts are consistent with the etymology of the word dock. The word "dock" sometimes in the past spelled "dok" is most likely Middle Dutch in derivation and similar to the Middle Dutch word "docke" or channel. See 3 Oxford English Dictionary 568-569 (1933). Although its ultimate origin is uncertain, the word appears to be related to the medieval Latin "doga" (ditch or canal), Greek "δοχή" (receptacle), and Icelandic "dökk" (pit or pool). Its first recorded English use is in Douglas' 1513 translation of Virgil's Aeneid, x, vi 22, where it has the meaning of the hull-formed bed (in the sand or ooze) in which a ship lies dry at low water. As time passed, the meaning of "dock" came to encompass an increasingly larger area. First, it was used to designate the artificial basin excavated (and built round with masonry and fitted with flood-gates) into which ships were received for purposes of loading or unloading or for repair. Several nineteenth century Massachusetts cases make reference to "dock" in this light. See *Nichols* v. *Boston*, 98 Mass. 39 (1867); *Breed* v. *Lynn*, 126 Mass. 367 (1879). Later the word also came to include the area surrounding the basin where material was off-loaded from ships or what earlier would have been called "wharves". Of this expansion in meaning Collins, L.J., noted in *Hennessey* v. *McCabe*, [1899] 1 Q.B. 491, 495, "I think that the word 'dock' is used in its ordinary sense — that is a place which embraces the land bounding the water space as well as the water itself." See also *Brown* v. *Linnell*, 359 Mass. 446 (1971). In the Twentieth Century, as modern commercial cargo carrying vessels became longer and capable of transporting larger cargos, the latter definitions superseded the earlier definitions of "dock" and brought within their scope the land near the dock as an integral part of the dock proper.

There can be little doubt that Eastern's proposed use of its waterfront site conforms to this definition. Large ocean-going cargo vessels approach Eastern's site through the deep water of Chelsea Creek. Upon arrival, they are moored at a stringpiece where large crawler cranes engaged by Eastern off-load their cargos of salt. Later, the salt is moved to an adjacent storage area on the site where it is kept until purchasers truck it away.

Does the existence of a storage area as a holding and distribution point for the salt transform the dock into a wholesale business storage and distribution area? We think not. As the expert witnesses noted (and common sense dictates), a commercial dock will of necessity require some storage area from which the distribution of cargo can occur. Without such an area, customary docking activities would be virtually impossible (or economically unfeasible) because there would be no place to put cargo that had arrived by ship but had not yet been delivered to its ultimate destination. Storage, therefore, appears as necessary to a dock as a loading or unloading space for a factory, parking for a shopping center, or grandstands for a ball-park. There was nothing to show that Eastern's proposed storage area is larger than or different from storage areas ordinarily associated with other commercial docks, or that Eastern's distribution activities will be greater than the storage of other products at docks such as lumber, metals, automobiles, or newsprint, or in any other way unusual. It becomes apparent that, while a commercial dock shares some common features with wholesale storage or distribution facilities, a dock constitutes a use different in kind from storage and distribution uses. We conclude that storage is authorized by the very nature of a commercial dock, at least in so far as that term is used in the context of the Chelsea zoning ordinance.[12]

2. The city makes certain other contentions in an effort to refute the conclusion that Eastern's planned enterprise will

---

[12] The conclusion is also supported by the requirement in § 4.1.4(1) (a) of the ordinance that "equipment" used in connection with a wholesale business and storage facility be "completely enclosed in a building." See note 9, *supra*. It would be impossible to enclose the large cranes used by Eastern to off-load its cargos.

constitute the operation of a commercial dock. We briefly discuss each contention.

(a) The amount of time the salt will remain in the storage area is of no particular consequence. There was expert testimony that there is no fixed time that cargo remains in a dock's storage area and that, in any case, the length of time is not particularly relevant since at a well run dock the amount of cargo held in storage is relatively constant, newly unloaded cargo replacing cargo that has been recently carried away. Moreover, there was no evidence to suggest that Eastern was in business simply to stockpile salt. In the over-all scheme of things, the piles of salt to be stored by Eastern are foreseen as "moving piles" continually flowing from ship to user.[13]

(b) The fact that Eastern will operate the site for the unloading only of its own cargo does not deprive the dock of its status as a commercial dock. The dock is used for commercial purposes and nothing else. As the Land Court judge observed "there is no requirement in the [o]rdinance that [a] commercial dock be open to the public or be a common carrier facility." As far as this ordinance is concerned, a commercial dock is a commercial dock whether it is public or private so long as it is used for commercial purposes.

(c) The Land Court judge properly rejected the building inspector's opinion as to what constituted a commercial dock under the ordinance. See generally, 3 Rathkopf, Zoning and Planning § 42.07, at 72 (4th ed. 1985). That city official's view was based on an erroneous construction of the ordinance based on the typesetting error in one of its previous printings mentioned earlier. See note 8, *supra.* We note that the building inspector persisted in clinging to his interpretation long after it

---

[13] The city's argument that distinctions could be made on the basis of the number of days ships were docked at Eastern's facility is not persuasive, given the fact that a storage area is an integral constituent of a commercial dock. Additionally, such distinctions would unfairly penalize dock owners who choose to have their cargos delivered by a few larger ships rather than by many smaller ones. It should also be noted that Eastern is importing something for its own account and is not running an operation like the Moran Container facility, where demurrage charges are important and necessary.

should have become apparent to him that his interpretation was fundamentally unsound. Moreover, if the building inspector's interpretation were to be accepted, every docking facility would by definition become a storage and distribution area, a consequence which would effectively deprive the term "commercial dock" of any meaning and render its inclusion in the ordinance superfluous. Such a result is disfavored. See *Commonwealth* v. *Woods Hole, Martha's Vineyard & Nantucket S.S. Authy.*, 352 Mass. 617, 618 (1967); *In the Matter of Yankee Milk, Inc.*, 372 Mass. 353, 358 (1977). For these reasons, the building inspector's interpretation was not entitled to deference. See *MacGibbon* v. *Board of Appeals of Duxbury*, 356 Mass. 635, 639-640 (1970); *Hebb* v. *Lamport*, 4 Mass. App. Ct. 202, 209 (1976); *McDonough* v. *Contributory Retirement Appeal Bd.*, 15 Mass. App. Ct. 14, 15 (1982).

(d) We see nothing in *Kreger* v. *Public Bldgs. Commr. of Newton*, 353 Mass. 622 (1968), or in *Salah* v. *Board of Appeals of Canton*, 2 Mass. App. Ct. 488 (1974), the decisions relied upon by the city, which directly influences this case. In neither case was the definition of a "commercial dock" in issue.[14]

(e) The city's passing reference in its brief to possible environmental problems created by wind-blown salt need not detain us. Environmental issues were not raised before the Land Court and have no bearing on a determination of the use proposed by Eastern or its lawfulness under the ordinance.

(f) Similarly, we may ignore the question whether Chelsea, in the exercise of its police power, may require the enclosure of Eastern's salt storage area, since that question was not brought before the Land Court.

3. Our conclusions that Eastern's operations involve the conduct of a commercial dock, which is a principal permitted

---

[14] *Kreger* dealt with the definition of a "[w]holesale business or storage warehouse," and *Salah* concerned a "warehouse or distribution plant." While both cases discussed concepts of storage and distribution they did not do so in the context of a commercial dock or the storage necessary for the maintenance of such a dock.

use under the ordinance, and that storage is a constituent part of that use, render it unnecessary to consider whether Eastern's storage of salt could lawfully occur under § 4.1.4(4) of the ordinance as "accessory and subsidiary" to other permitted uses such as wholesale business and storage or distribution uses.[15]

4. The Land Court judge considered G. L. c. 185, § 1 ($j\frac{1}{2}$) and G. L. c. 240, § 14A, as essentially declaratory judgment statutes designed to ascertain the validity and scope of municipal enactments like a zoning ordinance. As a consequence, she made the determinations necessary to spell out the rights of the parties under the applicable portions of the Chelsea zoning ordinance and entered orders needed to effectuate those determinations. We concur with the relief granted and the judge's observations concerning future resolution of the dispute. The Land Court may retain jurisdiction of the case for any future proceedings that may be necessary.

*Judgment affirmed.*

---

[15] To the extent that the judge found it necessary to comment on the relationship between § 4.1.4(4) of the ordinance and storage in connection with a commercial dock, we agree with her interpretation of the ambiguous language of the provision, and with her conclusion that the requirements of § 4.1.4(4), if applicable at all to Eastern's operations, are satisfied by Eastern's planned use.