DERBY REFINING COMPANY & another[1] *vs.* CITY OF
CHELSEA & another.[2]

Suffolk. April 4, 1990. - June 19, 1990.

Present: LIACOS, C.J., WILKINS, LYNCH, O'CONNOR, & GREANEY, JJ.

*Zoning,* Nonconforming use or structure, Liquid asphalt storage facility.

Two corporations' use of certain waterfront property in the city of Chelsea
as a liquid asphalt storage facility was protected as a preexisting, non-
conforming use under G. L. c. 40A, § 6, from the application of a new
Chelsea zoning ordinance purporting to prohibit the use, where the fa-
cility constituted a lawful use existing on the property when notice of
the revision of the zoning ordinance was first published, and where the
corporations' use of the property as a liquid asphalt storage facility did
not constitute, in the language of G. L. c. 40A, § 6, a "change or sub-
stantial extension" of the previous use of the property as a petroleum
storage facility. [708-717]

CIVIL ACTION commenced in the Land Court Department
on April 2, 1987.

The case was heard by *Marilyn M. Sullivan,* J.

The Supreme Judicial Court on its own initiative trans-
ferred the case from the Appeals Court.

*Ira H. Zaleznik* for the defendant.

*Robert C. Gerrard (Carol R. Cohen* with him) for the
plaintiffs.

GREANEY, J. The question in this case is whether Belcher
New England, Inc. (Belcher), may operate a liquid asphalt
storage facility on waterfront property at 99 Marginal Street

---

[1]Belcher New England, Inc. The plaintiffs are affiliated corporations
which we shall refer to collectively in this opinion as Belcher because
Belcher is operating the liquid asphalt facility in issue.

[2]The inspector of buildings of Chelsea. We shall refer to the defendants
collectively as Chelsea.

in Chelsea. Belcher maintains that its use of the property is protected under G. L. c. 40A, § 6 (1988 ed.), as a prior non-conforming use, from the application of a new Chelsea zoning ordinance which purports to prohibit the use. Belcher also argues that the new Chelsea zoning ordinance is invalid. Chelsea maintains the converse of both propositions. We transferred the appeal from the Appeals Court on our own motion. We conclude, as did the Land Court judge who heard and decided the case, that the use is protected by G. L. c. 40A, § 6. Consequently, we need not address the arguments pertaining to the validity of the new zoning ordinance.

Belcher brought the action in the Land Court[3] to determine whether the new Chelsea zoning ordinance applied to the property. The judge conducted a lengthy trial, which included testimony from several expert witnesses and personal inspections of the property from the shore and from a tugboat. We take the facts from the judge's extremely thorough memorandum of decision.

The property lies on the bank of the Chelsea Creek in Chelsea, in a highly industrialized neighborhood formerly designated as an industrial waterfront district. As described in *Mahoney v. Chelsea*, 20 Mass. App. Ct. 91 (1985), a decision referred to by the judge as accurately depicting the area she observed on the views, "[t]he district is generally old and unattractive and is composed largely of oil tank farms, warehouses, junkyards, and a shipyard. Abutting the district is an industrial district which contains a junkyard, a truck sales office, a fruit and produce warehouse and land owned by the Quincy and Sun Oil Companies. The banks of the creek in East Boston across from the site are lined with oil tank farms and a salvage yard." *Id.* at 92.

Title to the property was acquired in the 1920's by Texaco Oil Refining and Marketing, Inc. (Texaco), or its predecessor

---

[3]The action was brought pursuant to G. L. c. 185, § 1 (j ½), and G. L. c. 240, § 14A (1988 ed.). See *Banquer Realty Co.* v. *Acting Bldg. Comm'r of Boston*, 389 Mass. 565, 569-571 (1983).

corporations. Some time around 1960, Texaco constructed a
petroleum storage facility on the property by installing seven
large storage tanks, a dock, "breasting dolphins," and a
truck-loading ramp. Ocean-going tankers would dock at the
breasting dolphins, hook onto the permanent system of pip-
ing, and pump their cargoes directly into the storage tanks.
Those cargoes included three grades of gasoline, ship ker-
osene, two grades of aviation fuel, and a petroleum product
called "No. 2 fuel," which is similar to diesel fuel. The petro-
leum products then would be pumped from the storage tanks
to a loading rack for direct delivery into trucks by means of a
second system of pipes equipped with downspouts. The facil-
ity also includes two brick buildings, which housed Texaco's
offices, warehouses, and physical plant, and a separate ga-
rage to house and service delivery trucks.

Texaco continued to operate the petroleum storage facility
on the property until 1983, when, in response to changing
economic conditions in the industry, it entered an agreement
entitling it to joint use of a similar facility owned by Gulf Oil
Corporation on Eastern Avenue in Chelsea. Texaco then pro-
ceeded to "mothball" the Marginal Street facility. This pro-
cess included pumping out the storage tanks, hiring a con-
tractor to clean them, purging the feed lines, filling them
with a chemical preservative, and sealing them. The business
office was closed, and its contents removed. However, Texaco
continued to heat the building, and hired a security firm to
check the premises.

After "mothballing" the property, Texaco tried to sell it.
Texaco marketed the facility in the same way that it custom-
arily disposed of other properties no longer needed in the op-
eration of its business. It placed advertisements in trade jour-
nals and made contact with petroleum suppliers to ascertain
whether they might be interested in a purchase. In addition
to these marketing efforts, Texaco hired a firm to install a
"cathodic protection system" to preserve the steel of the
empty tanks for the next user. Texaco also maintained the
flammable storage licenses issued pursuant to G. L. c. 148,
§ 13 (1988 ed.), for the entire period during which the prop-

erty was on the market for sale. The judge found that Texaco "was anxious to sell the facility and to realize the highest possible price therefor which would appear to be the use which had been made of the locus for many years."

After one proposed sale fell through, Texaco succeeded in selling the facility to Derby Refining Company (Derby) on January 15, 1986. On that same date, Derby leased the facility to Belcher. The Chelsea zoning ordinance in effect when Derby took title to the premises from Texaco provided for an industrial waterfront district. Permitted uses in this district included "oil and gas tank farms including distributive facilities." The use of the property as a petroleum storage facility thus was a conforming use at the time of Derby's acquisition of the property.

Belcher immediately set about to determine the best use to make of the property. It ultimately decided to operate a liquid asphalt storage facility on the premises.[4] To prepare for this use, Belcher installed a hot oil heating system to heat the tanks and pipes so that the asphalt could be preserved in a liquid state for pumping. Belcher also insulated the exteriors of three of the storage tanks to prevent heat loss,[5] added scales to the truck-loading dock, and made various other modifications to the pipes, valves, and tanks. This work began in the summer of 1986.

On March 14, 1986, after Derby had purchased the property but before Belcher had begun work to prepare it for asphalt storage, notice appeared in the Chelsea Record, a newspaper of general circulation in Chelsea, of a public hearing to be held on proposed amendments to the zoning ordinance. The new zoning ordinance passed pursuant to that notice radically changed the permitted uses in the new waterfront district which was no longer zoned as an *industrial* waterfront district. The new ordinance provides: "The

[4]The judge found that, like the various gasolines and grades of fuel oil that Texaco had previously stored at the facility, liquid asphalt is a petroleum derivative.

[5]Of the seven storage tanks on the premises, Belcher utilizes only three in its asphalt storage operation.

purpose of the Waterfront District is to provide an area for uses which are water related and/or which benefit from the proximity to the airport or the harbor, and to encourage public access to the waterfront." Belcher's intended use of the property as an asphalt storage facility was rendered a nonconforming use by this new zoning ordinance.

In September of 1986, Belcher applied for a certificate of occupancy for the facility. After first determining that the certificate should issue, and notifying Belcher to that effect, the building inspector of Chelsea had second thoughts, and revoked the portion of the certificate relating to asphalt storage "pending the satisfactory documentation regarding the emission of objectionable vapors." Belcher continued to press for full approval, but decided to withdraw its application in February, 1987. In March, 1987, Belcher again applied for a certificate of occupancy. The application was denied, and this action ensued.

The issue at trial was whether Belcher's use of the property as a liquid asphalt storage facility was protected as a preexisting, nonconforming use under G. L. c. 40A, § 6 (1988 ed.), set forth in relevant part below.[6] The judge reasoned that the decision turned on the answer to two questions raised by the language of § 6: (1) Was there a use of the property "lawfully in existence" on March 14, 1986, the date of first notice concerning the proposed amendment to the zoning ordinances, and (2) Is Belcher's use of the property as

---

[6] "Except as hereinafter provided, a zoning ordinance or by-law shall not apply to structures or uses lawfully in existence or lawfully begun, or to a building or special permit issued before the first publication of notice of the public hearing on such ordinance or by-law required by section five, but shall apply to any change or substantial extension of such use, to a building or special permit issued after the first notice of said public hearing, to any reconstruction, extension or structural change of such structure and to any alteration of a structure begun after the first notice of said public hearing to provide for its use for a substantially different purpose or for the same purpose in a substantially different manner or to a substantially greater extent . . . ."

This statute maintains the essential principles set forth in the prior G. L. c. 40A, § 5, for nonconforming uses and makes relevant the decision construing similar provisions of § 5.

a liquid asphalt storage facility a "change or substantial extension" of Texaco's prior use of the property? The judge answered the first question in the affirmative, and the second in the negative.

1. *Preexisting lawful use.* We agree with the judge that the case should be decided by application of the two provisions of G. L. c. 40A, § 6, quoted above, to the facts. The first consideration is whether the facility constituted a lawful use existing on the property when notice of the revision of the zoning ordinance was first published on March 14, 1986. Chelsea makes two arguments in support of its contention that there was no lawful, preexisting use on the property on March 14, 1986. First, Chelsea contends that Texaco had abandoned use of the property when it mothballed the facility in 1983.[7] Second, Chelsea argues that, even assuming an abandonment had not occurred, Belcher's use of the property as a liquid asphalt storage facility is not a lawful use because Belcher lacked requisite United States Coast Guard (Coast Guard) approval. We address each argument in turn.

a. *Abandonment.* Under Massachusetts law, the right to continue a nonconforming use is not confined to the existing user, but runs with the land. See *Revere* v. *Rowe Contracting Co.*, 362 Mass. 884, 885 (1972). However, that right can be lost if a predecessor in title has abandoned the use. See *Wayland* v. *Lee*, 325 Mass. 637, 642 n.2 (1950), and cases cited. To constitute an abandonment, the discontinuance of a nonconforming use must result from "the concurrence of two factors, (1) the intent to abandon and (2) voluntary conduct, whether affirmative or negative, which carries the implication of abandonment." *Pioneer Insulation & Modernizing Corp.* v. *Lynn*, 331 Mass. 560, 565 (1954). See *Cape Resort Hotels, Inc.* v. *Alcohol Licensing Bd. of Falmouth*, 385 Mass. 205, 220-221 (1982); *Dawson* v. *Board of Appeals of Bourne*, 18 Mass. App. Ct. 962, 963 (1984).[8]

---

[7]There appears to be no dispute that Texaco's use of the property prior to 1983 was a valid use under the zoning scheme in effect at that time.

[8]We reject Chelsea's suggestion that the judge erred by not finding that the lack of active use in 1986 made the use nonexistent. It is not disputed

Mere nonuse or sale of property does not, by itself, constitute an abandonment. See *Cape Resort Hotels, Inc.* v. *Alcohol Licensing Bd. of Falmouth, supra* at 221; *Pioneer Insulation & Modernizing Corp.* v. *Lynn, supra* at 565; *Wayland* v. *Lee, supra* at 642 n.2; *Paul* v. *Selectmen of Scituate,* 301 Mass. 365, 370 (1938). Additional facts must be present before a finding of abandonment is warranted. Chelsea points primarily to three such facts: that Texaco (1) "mothballed" the facility; (2) applied for a property tax abatement for 1985; and (3) notified the Coast Guard that it no longer intended to operate a deep-water terminal on the premises.

The fact that Texaco "mothballed" the facility constitutes evidence of nonuse, but is not enough by itself to require a finding of abandonment. We agree with the judge that the reasonable inference to be drawn from the manner in which Texaco shut down the facility is precisely the opposite of abandonment — that Texaco intended to preserve the facility in good condition for a profitable resale. We also agree with the judge that Texaco's application for a 1985 property tax abatement merely reflected the fact that the facility was no longer producing income for Texaco. Consequently, that

---

that Texaco had been operating a petroleum storage facility on the property for several years prior to the zone change. The fact that active use of the storage facility had been temporarily suspended did not require a finding that the use no longer existed. See *Morin* v. *Board of Appeals of Leominster,* 352 Mass. 620, 623 (1967), where the court dealt with an analogous situation in which the use of property had been suspended, and concluded that the use would be in existence as a valid nonconforming use "provided [the owner] had not abandoned the use . . . prior to the adoption of [new] ordinance." Thus, the relevant issue in this case is whether that previous use had *ceased* to exist for practical purposes prior to March 14, 1986. See 1 R.M. Anderson, American Law of Zoning § 6.65 (3d ed. 1986). Chelsea's contrary argument essentially attempts to convert the noun "use," as it is employed in G. L. c. 40A, § 6, to the verb "use" which conveys ongoing activity. The distinction between the terms is pointed out in *Paul* v. *Selectmen of Scituate,* 301 Mass. 365, 370 (1938). Accordingly, the judge was correct in applying the subjective abandonment test to the facts. By contrast, the cases cited by Chelsea, see *Everett* v. *Capitol Motor Transp. Co.,* 330 Mass. 417 (1953); *Billerica* v. *Quinn,* 320 Mass. 687 (1947), deal with the issue whether any prior use had even *begun* to exist, and are, for that reason alone, inapposite.

application could be found by the judge as not showing an intent to abandon. Chelsea makes much of a letter sent by Texaco to the Coast Guard in which Texaco stated that it no longer intended to operate a deep-water terminal facility. Chelsea suggests, referring to *Dawson* v. *Board of Appeals of Bourne*, 18 Mass. App. Ct. 962 (1984), that the letter manifests an intent to abandon "as a matter of law." Reliance on the *Dawson* decision is misplaced. In *Dawson*, the plaintiffs had operated a nursing home prior to a change in the zoning law which rendered such use nonconforming. Approximately two years after closing the home and voluntarily surrendering their license to operate it, the plaintiffs sought a special permit to use the premises for a different nonconforming use (apartments). In reversing the judgment for the plaintiffs, the Appeals Court held that "there was an abandonment of the use of the property as a nursing home when the license to maintain a nursing home was surrendered." *Id.* at 963.

The holding in *Dawson* rested on the fact that the plaintiffs voluntarily surrendered their operating license. By comparison, Texaco's action was mandatory; Federal law required it to "cancel, in writing, the letter for any facility at which oil transfer operations are no longer conducted." 33 C.F.R. § 154.110(c) (1989). Once Texaco determined that it would close the facility pending a sale, it had no choice but to notify the Coast Guard of the cancellation of its letter of intent. This involuntary action carries little persuasive weight when compared with Texaco's voluntary action of diligently renewing its flammable storage licenses in each year preceding the sale to Derby. See *Tamerlane Realty Trust* v. *Board of Appeals of Provincetown*, 23 Mass. App. Ct. 450, 454-455 (1987) (maintaining an innkeeper's license indicates an intent to use the premises as an inn). There are also no clear indicia of abandonment. For example, the property was not left unprotected or unsecured, it was not changed to a conforming use, and no buildings were demolished. See 4 A.H. Rathkopf & D.A. Rathkopf, Law of Zoning and Planning, § 51.08, at 51-144-145 (1983 & 1989 Supp.). Keeping in mind

that "[a]bandonment is primarily a question of fact," *Paul* v. *Selectmen of Scituate*, 301 Mass. 365, 370 (1938), we agree with the judge that Texaco's efforts, together with the affirmative steps taken to market the facility as a petroleum storage terminal, "are illustrative of Texaco's attempt to maintain the integrity of the premises as a marine distributive facility in order to sell it for such use. In short, even if Texaco had no further use of the locus for its own corporate purposes, it did not intend to surrender such use."

b. *Lawfulness of Belcher's use.* Chelsea next argues that the asphalt storage facility was not lawfully in existence at the time of the change to the zoning ordinance because Belcher at that time did not have a letter of intent to operate its facility on file with the Coast Guard. A valid nonconforming use is not rendered unlawful by failure to possess requisite government approval, provided that such approval can be easily obtained. See *Selectmen of Wrentham* v. *Monson*, 355 Mass. 715, 717-718 (1969). Here, Belcher's initial lack of Coast Guard approval was due in large part to the Federal regulation which compelled Texaco to cancel its existing letter of intent. 33 C.F.R. § 154.110(c). This cancellation was necessary before a new approval could be obtained. Furthermore, Belcher obtained Coast Guard approval shortly after completing its renovations to the facility. For these reasons, its use was not unlawful on the date of the zoning change.

2. *Change or substantial extension.* To be protected as a preexisting, nonconforming use, Belcher's use of the property must not constitute, in the language of G. L. c. 40A, § 6, a "change or substantial extension" of Texaco's previous use. See *Everpure Ice Mfg. Co.* v. *Board of Appeals of Lawrence*, 324 Mass. 433, 435-436 (1949) ("A lawful nonconforming use of land existing at the time of the adoption of a zoning ordinance which may be continued is substantially the same use to which the land was devoted when the ordinance became effective and not some other substantially different use unless the ordinance otherwise provides"). As the judge correctly ruled, the issue whether a "change or substantial extension" had occurred would be determined by the applica-

tion of the familiar three-part test enunciated in *Bridgewater* v. *Chuckran*, 351 Mass. 20 (1966). Under that test, we inquire: (1) "Whether the [current] use reflects the 'nature and purpose' of the [prior] use," (2) "Whether there is a difference in the quality or character, as well as the degree, of use," and (3) "Whether the current use is 'different in kind in its effect on the neighborhood.' " *Id.* at 23, and cases cited. See *Cape Resort Hotels, Inc.* v. *Alcohol Licensing Bd. of Falmouth, supra* at 212; *Revere* v. *Rowe Contracting Co.*, 362 Mass. 884, 885 (1972); *Jasper* v. *Michael A. Dolan, Inc.*, 355 Mass. 17, 23 (1968). As the one seeking protected status, Belcher had the burden of establishing compliance with the *Bridgewater* v. *Chuckran* test. See *Cape Resort Hotels, Inc.* v. *Alcohol Licensing Bd. of Falmouth, supra*; *Tamerlane Realty Trust* v. *Provincetown, supra* at 454; *Martin* v. *Board of Appeals of Yarmouth*, 20 Mass. App. Ct. 972 (1985).[9]

a. *Nature and purpose of the use.* Chelsea argues that the use of the facility has changed from the storage of fuel products to storage of a building material. In support of this contention, Chelsea cites to our opinion in *Jasper* v. *Michael A. Dolan, Inc.*, 355 Mass. 17 (1968). The defendants in *Jasper* operated a food market and an adjoining beer and wine package store on a residentially zoned property. Because the store predated the zoning regulation, it constituted a protected preexisting, nonconforming use. After passage of the

---

[9]Chelsea contends that the judge incorrectly placed the burden of proof on it. Pointing to the judge's finding that the evidence on the comparative health risks of petroleum fuels versus liquid asphalt was inconclusive, Chelsea argues that the judge's conclusion that no change in the use had occurred could have been based only on a misallocation of the burden of proof. However, comparative health risks were but one of several factors the judge considered on the issue of neighborhood impact, and her indication that the evidence was ambiguous was simply a reference to the inconclusive nature of the proof of that particular factor. As we shall discuss in more detail later in this opinion, other evidence before the judge provided support for her conclusion that, compared to Texaco's use, Belcher's use is not "different in kind in its effect on the neighborhood." A reading of the judge's decision and the transcript of the trial satisfies us that the judge was aware that Belcher had the burden of proof.

zoning ordinance, however, the defendants sought to transform the entire premises into a package store which would sell hard liquor in addition to beer and wine. Applying the *Bridgewater* v. *Chuckran* test, we held that "the sale of all-alcoholic beverages at the Belmont Street premises constitutes a new use and is in violation of the zoning ordinance." *Jasper, supra* at 24.

Our holding in *Jasper* rested principally on the consideration that "the operation of a separately conducted all-alcoholic package store is substantially different from the sale of beer and wine in connection with a food store." *Id.* at 24. This change would likely have resulted in a transformation in clientele, and a consequent change in impact on the surrounding neighborhood. Furthermore, as the *Jasper* case itself illustrates, the sale of beer and wine and the sale of hard liquor are treated separately for licensing purposes. This classification reflects a legislative determination that beer and wine are substantially different in character than more potent alcoholic beverages. These facts distinguish *Jasper* from the instant case.

We agree with the judge that Belcher's current use "is nearly identical in nature to that of Texaco: bulk deliveries by ocean-going vessels, bulk tank storage and wholesale distribution." In the absence of a demonstrated difference in neighborhood impact, a question we consider below, the fact that the product being delivered, stored, and distributed has changed from one petroleum product to another petroleum product does not mandate a conclusion that a change in the nature or purpose of the use has occurred. Compare *Cape Resort Hotels, Inc.* v. *Alcohol Licensing Bd. of Falmouth, supra* (change from residential hotel catering to elderly customers to entertainment complex catering to young, nonresident customers); *Everpure Ice Mfg. Co.* v. *Board of Appeals of Lawrence, supra* (change from ice business to fuel oil business); *Tamerlane Realty Trust* v. *Board of Appeals of Provincetown, supra* (change from restaurant to hotel). The judge was warranted in finding that Belcher had satisfied the first prong of the *Bridgewater* v. *Chuckran* test.

b. *Quality, character, and degree of use.* Chelsea argues that the character of the storage activities occurring on the property has changed due to the fact that liquid asphalt must be kept heated. Chelsea contends that the heating process produces offensive vapors, and has required substantial physical alteration to the facility, including the erection of two smokestacks. Because the issue of vapors will be dealt with below in our discussion of neighborhood impact, at this juncture we deal solely with the issue of physical alteration.

We held in *Cape Resort Hotels, Inc.* v. *Alcohol Licensing Bd. of Falmouth, supra,* that "a valid nonconforming use does not lose that status merely because it is improved and made more efficient," provided, however, that the changes are "ordinarily and reasonably adapted to the original use and do not constitute a change in the original nature and purpose of the undertaking." *Id.* at 215, quoting *Berliner* v. *Feldman,* 363 Mass. 767, 775 (1973). See *Morin* v. *Board of Appeals of Leominster, supra* at 624; *Wayland* v. *Lee, supra* at 643. Having concluded above that the original use of the property as a tank farm for petroleum products has not changed, we ask whether the modifications cited by Chelsea are "ordinarily and reasonably adapted" to that use. We conclude that they are. It is undisputed that liquid asphalt must be heated in order to prevent solidification, and that the modifications Belcher made to the facility were designed solely to accomplish that end. There is nothing to suggest that those changes were either extraordinary or unreasonable or that they changed the fundamental nature of the original enterprise. The judge was warranted in finding that Belcher had satisfied the second prong of the *Bridgewater* v. *Chuckran* test.

c. *Neighborhood impact.* The trial judge recognized that the third prong of the *Bridgewater* v. *Chuckran* test — pertaining to neighborhood impact — presented a close issue. In support of its contention that Belcher's liquid asphalt facility has a more deleterious impact on the surrounding neighborhood than Texaco's petroleum fuels facility had, Chelsea fo-

cuses on the offensive smells and potential health risks associated with the Belcher facility.

On the issue of neighborhood impact, the judge heard the following testimony. Two residents, who live next to the facility, testified that the asphalt exudes terrible odors. However, under cross-examination both residents admitted that various other businesses in their largely industrial neighborhood had also emitted offensive odors for years prior to Belcher's acquisition of the property.

Chelsea also presented testimony from two expert witnesses. A professional consulting engineer was retained to measure the emissions from Belcher's tanks at various sites around the neighborhood. The highest readings were taken at one owner's residence, where the expert recorded, over a twenty-four hour period, a total suspended particulate (TSP) concentration of 140 micrograms per cubic meter, and volatile organic compound (VOC) concentration of 320 micrograms per cubic meter.[10] The expert conceded that the twenty-four hour TSP exposure limit set by the Department of Environmental Quality Engineering (DEQE) (now the Department of Environmental Protection) is 250 micrograms per cubic meter, and that he had not compared the Belcher emissions to those produced by Texaco when it operated the facility. Based on the emission levels recorded by this expert, a risk assessment expert estimated an increased risk of approximately three cancer cases per 1,000 people over a lifetime of continuous exposure. The latter expert offered no figure comparing this risk to that produced by Texaco's tenure.

Belcher offered three expert witnesses to rebut the defendants' experts, and to provide their own assessments of the health risks associated with asphalt emissions. The first, the chief chemist and environmental toxicologist of an environmental consulting firm, estimated the number of increased cancers to be approximately six to seven per 1,000,000 people exposed continuously for seventy years to the levels of

---

[10] In very general terms, TSPs are visible particles while VOCs are invisible, gaseous emissions. Both are emitted from heated asphalt.

asphalt emissions found by the defendants' consulting engineer. The second expert, a doctor of toxicology and comparative pharmacology, supplemented this testimony by concluding, based on a review of existing professional literature, that no scientific basis exists to conclude that asphalt emissions, in the levels present here, represent a public health hazard. Finally, a third expert, a senior technical specialist in an environmental consulting firm, testified as to the contents of a DEQE report detailing the results of emissions tests conducted at the facility while it was being operated by Texaco, and compared those results to the Belcher emissions recorded by one of Chelsea's experts. This expert concluded that the VOCs emitted by Texaco were approximately seven times greater than those emitted by Belcher.[11]

The judge felt that the evidence on the comparative health risk of petroleum fuels and petroleum asphalt was ambiguous and inconclusive. Nonetheless, she concluded that Belcher

[11]Chelsea argues that the judge committed several errors in permitting the testimony of the experts presented by Belcher to testify. None of the arguments has merit, and they may be disposed of by brief discussion.

a. The judge did not abuse the considerable discretion vested in her, see *Kearns* v. *Ellis*, 18 Mass. App. Ct. 923, 924 (1984), in dealing with the delay in the disclosure of the experts offered by Belcher in rebuttal. See Mass. R. Civ. P. 26 (e)(1)(B), 365 Mass. 772 (1974). Counsel for Chelsea knew the identity of these expert witnesses for almost two months, had ample time to prepare, and chose to do nothing. The testimony of the experts was vital to a fair analysis of the issues in the case. In view of that fact, and the length of time available to Chelsea's counsel to prepare, the judge acted reasonably in allowing the testimony. See *Shaw* v. *Rodman Ford Truck Center, Inc.,* 19 Mass. App. Ct. 709, 713 (1985); *Giannaros* v. *M.S. Walker, Inc.,* 16 Mass. App. Ct. 902, 903 (1983).

b. The judge properly concluded that the third expert's testimony was properly based on facts about emission levels contained in a DEQE report which had arrived at the facts through a scientific testing process sanctioned by the United States Environmental Protection Agency. This is not a case where the expert relied on opinions and conclusions (as distinguished from facts) in someone else's report.

c. The judge did not err in concluding that the second expert's testimony concerning the chemical composition of asphalt had a sufficient basis in the expert's personal knowledge, including his knowledge of the molecular structure of asphalt. See *LaClair* v. *Silberline Mfg. Co.,* 379 Mass. 21, 32 (1979).

had satisfied the burden under the third prong of the *Bridge-water* v. *Chuckran* test by proving that: (1) its asphalt business operates only in warm weather, while the petroleum fuel business formerly run by Texaco operated year-round; and (2) Belcher uses only three of the storage tanks, while Texaco used all seven.[12] The judge also found that the current complaints regarding the odors emitted from the asphalt tanks might be due to the fact that the Belcher facility "is the current nemesis of the neighborhood while the Texaco problems have faded." We are satisfied that the judge's determination that Belcher's use is not "different in kind in its effect on the neighborhood" from Texaco's prior use has support in the evidence. Over-all, the case is one which is very dependent on its facts, the unusual nature of the Texaco and Belcher operations, the existing uses in a heavily industrialized waterfront zone, and the visual observations made by the judge. These considerations combine to make the judge's analysis of the situation a plausible one which necessarily ought to be sustained on appeal.

*Judgment affirmed.*

---

[12]Chelsea's contention that these comparisons are biased — because the figures for Texaco were taken during the period of that company's peak operations — is neither supported by the evidence nor legally relevant.