ERNEST J. PRIMM, PETITIONER, *v.* CITY OF RENO, AND BILL A. LIGON, E D W I N  S E M E N Z A, CHARLES E. COWEN, THOMAS H. HARVEY, ROY BANKOFIER AND MARSHALL GUISTI, AS MEMBERS OF THE CITY COUNCIL THEREOF, RESPONDENTS.

No. 3722

January 20, 1953.                    252 P.2d 835.

*Griswold and Vargas*, of Reno, and *Ryan and Bruington*, of Los Angeles, California, for Petitioner.

*Samuel B. Francovich*, city attorney, and *Bruce D. Roberts*, assistant city attorney, of Reno, for Respondents.

*Alan Bible* and *Robert L. McDonald*, of Reno, amici curiae.

8

# OPINION

By the Court, MERRILL, J.:

This is a proceeding in mandamus by which petitioner seeks to compel respondents to issue to him licenses to conduct gambling and dispense liquors on premises owned by him in the city of Reno. Applications for such licenses were duly made by petitioner and were denied by the Reno city council on October 22, 1951. Petitioner then sought a writ of mandate from the district court of Washoe county which was denied June 30, 1952. The petition in this matter was filed August 8, 1952.

Petitioner acquired the premises in question in 1946 for the purpose of establishing a gambling casino and bar. In 1951 he commenced extensive remodeling to this end. Upon denial of his application the premises were converted by petitioner into a restaurant. The premises are located on the west side of Virginia street in the block between Commercial Row and Second street. Eighteen business establishments occupy premises on this side of the block, including such businesses as restaurants, jewelry, clothing, sporting goods and drug stores. There are two bars, one of which in connection with its bar business operates two gambling games, poker tables and slot machines and is the only establishment on that side of the block licensed for and operating gambling games. Many of the business houses, however, have slot machines (numbering from 2 to 10) operated in connection with their various business enterprises. Around the corner from petitioner's establishment, a club on Commercial Row operates one gambling game and four slot machines in conjunction with a bar business. Across the street from petitioner on the east side of Virginia Street the block is solidly occupied by gambling establishments with the single exception of a bank building on the corner of Second Street. These are, for the most part, sizable gambling casinos: establishments

where gambling is not an incidental or accessory operation, but is the exclusive or primary operation. Petitioner's applications were for eight gambling games, 30 slot machines and a bar.

The source of the city's regulatory power is the city charter by which the legislature conferred on the council power "to fix, impose and collect a license tax on, regulate, prescribe the location or suppress all barrooms [or] gambling games * * *." (Article XII, section 10 (c) fourth; charter, city of Reno; 1937 Stats. of Nev. 440.) Pursuant to this provision, ordinances have been adopted by the city council relative to the issuance of gambling and liquor licenses. Denial of petitioner's application was not based upon failure to comply with the requirements of these ordinances but was based upon policy considerations which, while not in conflict with existing ordinance provisions, were not themselves incorporated in any ordinance.

In 1949 a resolution was adopted by the council limiting to a specified maximum number the bar licenses issuable in each of the wards of the city. This apportionment was modified by further resolution in 1950 which also provided that as to a specified area (which included the premises of petitioner) no licenses would be issued to premises not already licensed. Denial of petitioner's application for a bar license was apparently based upon this resolution.

As to his application for gambling games and slot machines, the policy considerations of the council had not previously been announced in any form whatsoever. The license was simply denied for the reason that the members of the council were in unanimous agreement that it would not be to the best interests of the community to permit the spread of gambling casinos to the west side of Virginia Street or the increase of licensed gambling in that block on the west side of Virginia Street.

Among the contentions of petitioner reflecting upon the legality of the council's action are the following:

That the council, under its charter powers, having elected to regulate by ordinance, must be governed strictly by ordinance in action upon license applications; that it may not deny a license upon considerations apart from ordinance.

That, regardless of prior enactments, the determinations of the council respecting limitation and restriction of business are of such a legislative character that, to be valid, they must have been enacted by ordinance.

That, considering the existence of gambling establishments in the area in question, the action of the council in denying petitioner's application was arbitrary and discriminatory.

That, considering the substantial investment of petitioner in reliance upon ordinance provisions and in consequent anticipation that a license would be granted, the action of the council was confiscatory.

These contentions must be held to be without merit under what has remained the settled law of this state for the past 21 years.

The prohibition against gambling was removed by statute effective March 19, 1931 (sec. 3302, N.C.L.1929, Supp. 1931–1941 et seq.). The nature and extent of the municipal power to regulate gambling under appropriate charter provisions was the subject of a decision of this court filed July 8, 1931. State ex rel. Grimes v. Board of Commissioners of Las Vegas, 53 Nev. 364, 1 P.2d 570, 572. To all intents and purposes, the operation of gambling as permitted by the statute and limited by the regulatory powers of the state as there set forth has been further limited, from the very inception of its legality, by the regulatory powers of municipalities as enunciated in the Grimes case. The statute and decision, hand in hand, have from the outset spelled out the limited rights of those who would engage in such operations.

In the Grimes case the Las Vegas board was empowered by charter "to fix, impose and collect a license tax

on all * * * games and gaming houses; to license and regulate gambling as allowed by law and to prohibit gambling in all its various forms." Pursuant to this authority, an ordinance relating to the licensing of gaming had been enacted under which the application in question had been made. The board rejected the application upon the ground that six licenses had already been granted and in the view of the board "public interest requires that no additional licenses * * * be granted in this city until the further order of this board and until further or other gaming licenses * * * are reasonably necessary for the accommodation of the public * * *." The court considered the contention of the applicant that "the discretion to grant or withhold a license must be exercised through some prescribed uniform rule of action," as otherwise it "would rest within the power of the council to grant or refuse at their mere whim or caprice and therefore amount to a discrimination unlawful under the constitution." It held that such was not necessary in the case of businesses such as gambling or dealing in alcoholic liquors which may be regarded as tending to be injurious. With reference to the municipal power of regulation it was stated:

"That the board of commissioners has power under this [charter provision] to regulate gambling in the city of Las Vegas, and has power, notwithstanding the legislature has legalized gambling, to absolutely prohibit it within the city limits, or prohibit it in part by zoning, cannot be denied. The power to restrict the number of licenses in the city is, we think, a very necessary implication from the power to license and regulate gambling. This discretion is derived from the police power of the state. It is necessarily incidental to the delegated power to license and regulate. On account of the nature of the business of gambling, which is capable of being so conducted as to be a source of evil, a very wide discretion is thus conferred, not only to restrict the number of licenses in the city, but to pass all reasonable rules and

regulations concerning it which the city authorities may deem necessary for the police government of the municipality."

By the Grimes decision, then, it is established that under appropriate charter provisions municipalities have the power to regulate the business of gambling as conducted within their geographical limits; that in the exercise of this power they may suppress gambling entirely, or may limit the number of establishments engaging in such business or the area within which they may operate; that regulation by limitation may be exercised by the granting or withholding of licenses and, so long as the action taken is not discriminatory or arbitrary, need not depend for its validity upon formal adoption of some uniform rule of action by ordinance or otherwise; and this regardless of the existence of a general licensing ordinance. (In that case, as in the case at bar, it is to be noted that the general licensing ordinance did not purport to be an exercise of any charter power of limitation. The ordinance did not touch upon that subject.)

It may be argued that adoption of any policy of restriction such as that here adopted should, out of regard for existing property rights and investments and in the interests of stability and business confidence, receive the formality and publicity of action by ordinance rather than the informality of action by resolution or the outright surprise which may well attend individual action upon license applications. On the other hand it must be recognized that the legalizing of gambling has placed a tremendous burden of regulation upon the municipalities of this state. Such bodies may well feel that complete freedom of action to meet changing conditions is essential to the paramount public interest; that such freedom cannot exist where limited by the formal legislative requirements of action by ordinance.

14

In effect it is the import of the Grimes decision that it is within the discretionary powers of the governing municipal board to balance these public and private interests against each other in determining the proper course and method of regulation. We may not, then, question a determination in favor of what is deemed to be the paramount public interest so long as the action taken be not arbitrary or discriminatory.

The Grimes case itself establishes that the action here taken may not be so characterized. It was action of limitation which that decision expressly recognizes as a proper mode of regulation. That petitioner was the first to fall under the limitation does not render the regulation improper. In such cases there must always be a first to be turned away empty handed.

Nor does the existence of slot machines in business establishments generally throughout the city render arbitrary or discriminatory the rejection of petitioner's application for such machines. It is one thing to apply for an appropriate number of machines as incidental or accessory to a restaurant business. It is quite another to apply for 30 machines to form an integral part of a gambling operation.

Nor may we regard the action of the council as confiscatory in the light of petitioner's anticipatory investment. The requirement of a license was known to him. The hazards of regulation were known to him. There has never been a time in the history of legalized gambling in this state when the operator or investor in such enterprises has been free from such occupational risks. As has been stated, "Surely the individual cannot be permitted to speculate upon the community's not exercising its constitutional powers and then claim that the community is barred from interfering with the speculation." (Bettman, Constitutionality of Zoning, 37 Harvard L.R. 834, 848.)

Petitioner's final contention raises a point of distinction from the Grimes case. In 1941 by statute (sec. 5063, N.C.L.1929, Supp. 1931–1941 et seq.) the legislature authorized enactment of municipal ordinances providing for city planning including regulation of the use of land. In 1947, expressly pursuant to this statutory authority, Reno enacted by ordinance a comprehensive land use zoning plan which specified bars and gaming as permitted land uses in the zone in which petitioner's premises are located. (Reno Municipal Code, sec. 14–54.) It is contended that denial of petitioner's license amounted to a change in the ordinance without the taking of the prescribed procedural steps; that the city may no longer, in regulation under its charter powers, "prescribe the location" of barrooms or gaming establishments save in accordance and consistently with the provisions of the zoning ordinance, since that ordinance constituted a formal exercise of such regulatory power.

This, however, is to confuse the nature and purpose of the two types of regulation involved and to read into the permissive language of the zoning ordinance a meaning not consistent with the general purposes of land use zoning. See: McQuillin on Municipal Corporations (3d ed.) sec. 25.12. Each type of regulation is the subject of separate and distinct legislative authority.

Regulation of land use through zoning has become desirable in urban communities in order that a reasonable and orderly segregation of residential, commercial and industrial areas be had. Such regulation is primarily concerned with uniformity of land use and stability of community growth. It is general and comprehensive in scope and the considerations which govern it are, accordingly, general and comprehensive. See: Bettman, Constitutionality of Zoning, supra; note, 17 Va. L.R. 202; 58 Am.Jur. 957, Zoning, sec. 27.

Regulation of certain types of businesses through discretionary licensing is made necessary by the fact that

the inherent character of those businesses is such that without regulation they might be so operated as to become nuisances. Such regulation is primarily concerned with proper operation or with limitation or distribution or outright suppression of operation. It is special and limited in scope and governed by consideration of the circumstances applying, at the time application is made, to the particular business under consideration, the person applying and the location proposed.

While some authorities appear not to object to an overlapping of considerations in the exercise of these differing types of regulation, (See: State v. Payne, 131 Conn. 647, 41 A.2d 908.), others are inclined to hold each type strictly to its proper sphere. For example it has been said (Bassett on Zoning, page 53) : "Neither can distribution of business be forced by zoning. If a locality is filled with theatres, and congestion is great on sidewalks and streets, the municipality cannot lawfully amend its zoning ordinance to exclude new theatres. The police department can control the traffic, or some licensing law may be devised to prevent new theatres, but it is not a proper field for zoning. The best zoning argument for a new theatre permit is that the block is already largely occupied with theatres. Just so a zoning plan cannot space gasoline stations a certain distance apart. Such a regulation is arbitrary and unconstitutional on its face, so far as zoning principles are concerned. If three gasoline stations are on opposite corners, a fourth will ordinarily be justified in zoning. The fair distribution of different kinds of business must be approached through private covenants or some method of trade regulation by the state or city, if any can be found. Zoning as we now understand it is not the proper instrumentality."

If a limitation upon the operation or distribution of gambling establishments is, then, to be accomplished,

in the views of this authority it may not be accomplished through an amendment of the zoning ordinance, but must be through some independent method of regulation. We need not go so far. We need not here decide as to the legality of land use zoning as a method of control in the distribution or limitation of businesses which, by virtue of their character, are made subject to regulatory control of that nature. It should in any event at least be clear that the regulation of land use by zoning does not *preclude* and is not *inconsistent* with independent regulatory limitation or distribution of businesses pursuant to independent statutory authority.

As stated in Ellis v. City of Winter Haven (Fla. 1952) 60 So.2d 620, 622, "[The statute authorizing a Winter Haven zoning ordinance] was enacted for an entirely different purpose than that which actuated the Legislature in reserving to the cities their power to regulate the location of liquor establishments within their limits. The purpose of [the zoning authorization] as in all zoning laws, was to authorize the city of Winter Haven to regulate, systematize and stabilize the growth and development of its urban area; and the fact that the adoption of a comprehensive zoning plan for the purpose might at the same time amount to a regulation of the location of places of business of liquor licensees—together with all other business establishments—is only incidental to the accomplishment of the main purpose." To the same effect is Moore v. McCarver (Tex.Civ.App. 1951), 240 S.W.2d 443.

In Marchesi v. Selectmen of Winchester, 312 Mass. 28, 42 N.E.2d 817, 819, the petitioner was denied a license to operate a bowling alley in a district which was zoned for that type of business. The court, in upholding the action of the board, stated, "The fact that the zoning by-law permitted bowling alleys in the districts in which they were to be located did not authorize their use in the absence of a license from the selectmen. * * * That such use was permitted by the zoning by-law could be

given such weight, if any, as the Respondents thought it was entitled to in conjunction with the various other matters involved in coming to an honest and impartial decision. The general aim, both of the zoning by-law and of the licensing statute, is the promotion of the public welfare, but each is independent of the other and seeks to accomplish its purpose by different means."

To say, then, as the land use ordinance says, that it is desirable in the public interest that such gambling establishments as may be licensed should (together with certain other businesses) be segregated within a specified commercial zone, does not mean that all property within that zone may, in the public interest, be devoted to gambling. To say that all property within that zone is generally adaptable to gambling use gives it no vested right to such use. The necessity for a license remains as does the regulatory power which is the principal purpose of the grant of authority to license.

As stated in Marshall v. Holbrook, 276 Mass. 341, 177 N.E. 504, 506, "But this zoning ordinance is not in its legal effect like a license or legislative sanction to carry on in a district every kind of business that may not be expressly excluded therefrom, and if there are reasons apart from the zoning law why the business may not legally be carried on in the district, the zoning law in the case at bar furnishes no protection to it." To the same effect: Beane v. H. K. Porter, Inc., 280 Mass. 538, 182 N.E. 823; Burroughs Landscape Constr. Co. v. Town of Oyster Bay, 186 Misc. 930, 61 N.Y.S.2d 123; People v. Elkin, 196 Misc. 188, 80 N.Y.S.2d 525.

Writ denied.

EATHER, C. J., and BADT, J., concur.