## AMEREIHN ET AL. *v.* KOTRAS ET AL.

[No. 97, October Term, 1949.]

*Decided March 8, 1950.*

594

The cause was argued before MARBURY, C. J., DELA-PLAINE, COLLINS, GRASON, HENDERSON, and MARKELL, JJ.

*Michael Paul Smith* and *M. William Adelson,* with whom was *J. Elmer Weisheit, Jr.,* on the brief, for the appellants.

*H. Richard Smalkin,* with whom was *Smalkin & Hessian* on the brief, for the appellees.

GRASON, J., delivered the opinion of the Court.

The appeal in this case presents for review a decree entered by the Circuit Court for Baltimore County, in Equity. By it the appellants are prevented from erecting an addition to the factory on their land for manufacturing goods which they had continually produced at the original factory for the last two years. In that time the gross receipts of the business have grown to the sum of $120,000.00 a year.

The facts out of which this case grew may be summarized as follows: In 1944, and for a long time prior thereto, Earl Powers was engaged in the business of a contractor and builder. In that year the country was at war, and building materials were rationed and difficult to procure. On the Belair Road, about two miles north of Overlea, there is a small residential settlement known as Overton, a plat of which is filed in the Land Records of Baltimore County and exhibited in this case. It is on the east side of Belair Road, and Overton Avenue extends from that road easterly along the north side of the tract 243 feet and 10 inches. Overton Avenue is 30 feet wide and houses built on each side thereof. Powers entered into a contract to purchase from the owner part of the land shown on the plat, subject to the issuance of a permit to him by the Zoning Commissioner to erect "a shop to be used in the Building, manufacturing and prefabricating work in the lumber business". He said at that time he could not obtain door jams, joists, carriages, and articles of that type, and he wanted to make them in the building to be erected upon this property.

On September 19, 1944, he wrote the Zoning Commissioner. In that letter he stated he desired to erect a building 50 feet wide and 100 feet deep and from the ground to the ridge of the roof would be 20 feet; that it would be erected at least 200 feet from Overton Avenue and about the same distance from Belair Road. He stated: "This shop will be used for builder's purposes, and we will have therein several saws, planer, and

other woodworking tools, run by electrical motors, which will range in size from one-half to two horse-power. Also will be stored in the building at no time more than two truck loads of lumber, besides various small contractors' tools and equipment used in building and repair construction. There will be no materials kept on the outside of building, nor no kinds of machinery."

Mr. Timanus, purporting to act as "Zoning Commissioner of Baltimore County", received this letter. He advertised the matter, posted the property, set a date for hearing, and after the hearing, on the 20th day of October, 1944, zoned a certain part of the property, which is described by metes and bounds, courses and distances, in his order, "from a residential use area to a commercial use area, to permit of the erection and use of a Building Contractor's Shop, of the size 40' x 100', and the height and use of buildings and the use of adjacent land to be limited for the purposes only as stated in letter from the Powers Construction Company, (contract purchaser), under date of September 19, 1944."

Mr. Powers erected a building 40 feet wide by 90 feet long and about 20 feet high, in the southeast part of this tract, installed machinery which was operated by electricity, and proceeded to manufacture building materials. At the hearing of this application before Mr. Timanus there were only a few people from the community present. No real complaint against the proposed project was made, but there was some apprehension, at least by one witness, lest the factory be enlarged. The permit was issued.

Mr. Powers said that he obtained priority from the Government to get materials necessary to construct this factory; that he had contracts from the Government to supply Fort Meade with materials he intended to make at this plant, and other contracts, and had use for the materials in his own business. It may be supposed that time was important to Powers and he wanted to start work at this plant as soon as possible. There is some confusion in the testimony regarding when he started to

work on the building. He testified, in chief: "We got the building permit and we started to build the building some time about the middle of November, and about the early part of January we started work there." He was asked on cross-examination:

"When did you actually start operation at this building? A. As soon as we got the roof on and the floor in.

"Q. When was that? A. I think we had the building under roof and the floor in before Christmas of 1944.

"Q. And you started before Christmas of 1944? A. I think we did. I can't verify that because that's just speaking for memory. I know that we were in operation there some time in January.

"Q. I hand you this (indicating) and ask you to identify it. Is this your signature? A. Yes. The man that brought me (this) up there said he had a bet on when we started to work, and I said as far as I knew I didn't think we started to work in there until about the 15th of January.

"Q. And you signed that on January 20th, 1949: 'This is to certify that I did not occupy the Mill Building on the south side of Overton Ave., in Fullerton, prior to Jan. 15th, 1945.' A. When I gave him that I told him I was speaking from memory."

He afterwards testified: "We started that building, I can tell here, when we put the mortgage on record and when we went into the building. This man that came up there wanted to win a bet of $50 and I didn't have these papers available at that time. Here's a paper dated November 6th, 1944, the date I put through the loan to build this building, with the building and loan association. They put the loan through on November 9th, and we immediately went into construction of that building there and it took us about four weeks to put it up. Q. What year was that? A. November 9th, 1944." This testimony of Powers regarding when the building of the factory started and when it was completed is uncontradicted. It seems to us perfectly patent that the certification obtained from Powers by an unknown man

598

who wanted to win a bet that Powers did not occupy the building until January 15th, 1945, was obtained for the purpose of this case. Powers stated that he was speaking from memory regarding this, but he thereafter refreshed his memory regarding the date when he put through the loan with the building association to obtain money to erect the building; that the same was put through on November 9, 1944, and that he immediately started to work on the building and finished it in about four weeks. We are satisfied from this evidence that Powers did start the work on this factory at that time and completed it in about four weeks. Powers continued this business until October, 1945. During that time he used from seven to ten thousand feet of lumber a day and handled as much as fifty thousand feet of lumber there in a week. The lumber was delivered by truck and a truck hauled from eight to twelve thousand feet of lumber. He employed, on the average, about eight to ten men. He had no complaint from people in the community about the conduct of the factory. The record discloses there was no objectionable noise caused by the operation of the factory. No one in the community visited the factory, except on one occasion one of the neighbors took a sled belonging to his boy and had a runner welded.

The evidence permits the inference that people living in the community got waste lumber from the factory, which they used as fuel. There is nothing in the contention that this factory was operated secretly for the purpose of preventing neighbors in the community from knowing what was going on in the factory.

The records of the Buildings Engineer show that the factory was completed on January 23, 1945, and a certificate of occupancy issued January 24, 1945. It is contended that this shows that the building was not commenced until after January 2, 1945. Mr. Powers states that he never saw a building inspector at the building. This record cannot be preferred over the positive testimony of Mr. Powers as to when he started to erect the factory.

In October, 1945, Powers sold this property to Messrs. Offutt and Gibbs. They operated the factory until the fall of 1946, a period of six to eight months, when they sold the same to the appellants in this case, who moved in and took possession of the property. They had conducted light manufacturing at a location at Belair Road and Seidel Avenue and it became too small for their purposes. They moved from Seidel Avenue to the property in question in 1946, and brought their office force there and two pieces of machinery similar to the machinery which Powers had installed. Ninety per cent of the business of the appellants was making iron railings for porches and steps. Later, in addition thereto, they cut iron pipes for the purpose of making fence posts. These posts were set in concrete and strung with wire. They sold such fences and erected same. The fence business was only about ten per cent of the business conducted at the factory. For two years material was delivered to the factory and finished products hauled away and delivered to customers, and there was no complaint by the neighbors or people in the community, except on two occasions, which seem to have been trivial.

In 1948 they desired to enlarge this factory for the purpose of carrying on the same business. The immediate purpose was to store material, but they intended to expand manufacturing therein as their business required. They saw some of the people in the community and told them what they were going to do, and took the matter up with Mr. Doing, the then Zoning Commissioner. Mr. Doing told them that Powers had a nonconforming use to conduct light manufacturing; that Messrs. Offutt and Gibbs continued light manufacturing after they purchased the property from Powers, and the nonconforming use existed, and as their business was light manufacturing and was a nonconforming use they did not need a permit. Some of the neighbors came to see Mr. Doing. He told them what his opinion was. The appellants secured a building permit from the Build-

ings Engineer for an addition to the factory, not exceeding its original size (Section XI—Nonconforming Uses, Zoning Regulations and Restrictions for Baltimore County) and started the addition. Time for an appeal from the Zoning Commissioner's action having expired, this case was instituted.

The bill sets out many of the facts narrated, and prays: a. that the appellants be restrained from proceeding with the construction of the addition to the factory; b. that they be restrained from exercising any and all rights whatsoever under the building permit issued by the Buildings Engineer; c. restraining them from using their property for manufacturing purposes; d. that the Buildings Engineer be required to revoke and cancel the building permit; e. that the Zoning Commissioner be directed to rescind his approval of said building permit.

A demurrer was filed to this bill and overruled. An answer was filed denying the material allegations of the bill, and testimony taken.

By Chapter 247 of the Acts of 1941, the County Commissioners were authorized and empowered to adopt a comprehensive plan of zoning regulations for Baltimore County. Zoning regulations, under the authority of this Act, were adopted and approved by the County Commissioners, effective January 2, 1945, and until that date there were no zoning regulations in Baltimore County. Property owners, until that date, were privileged to use their property for any lawful purpose. It needs no authority for the proposition that light manufacturing conducted so as not to cause a nuisance is a lawful use of property in the absence of reasonable zoning regulations. It is well established law that if a person, prior to the time zoning regulations are effective, commences to build on his property a building for the purpose of conducting light manufacturing (as in this case) and expends money in the erection of such a building, or in partially erecting such a building, subsequent zoning regulations cannot prevent him from completing the

building and conducting light manufacturing therein. If his property is within an area thereafter zoned as residential he, nevertheless, is regarded as having a nonconforming use for the purpose of conducting his business in that area. The effect of zoning regulations is in the future—their operation is prospective, to protect and preserve, not destroy. *Dal Maso v. Board of County Commissioners*, 182 Md. 200, 34 A. 2d 464; *Kahl v. Consolidated Gas & Elec. Co.*, 191 Md. 249, 257, 60 A. 2d 754, 755, 757, 758.

If a property is used for a factory, and thereafter the neighborhood in which it is located is zoned residential, if such regulations applied to the factory it would cease to exist, and the zoning regulation would have the effect of confiscating such property and destroying a vested right therein of the owner. Manifestly this cannot be done, because it would amount to a confiscation of the property, and nonconforming use is a vested right and entitled to constitutional protection. *Adams v. Kalamazoo Ice & Fuel Co.*, 245 Mich. 261, 222 N. W. 86; *N. Y. State Investing Co. v. Brady*, 214 App. Div. 592, 212 N. Y. S. 605; *Pelham View Apts. v. Switzer*, 130 Misc. 545, 224 N. Y. S. 56, 58; *Darlington v. Board of Councilmen*, 282 Ky. 778, 140 S. W. 2d 392; *City of Coldwater v. Williams Oil Co.*, 288 Mich. 140, 284 N. W. 675; *Atkinson v. Piper*, 181 Wis. 519, 195 N. W. 544; *Brown v. Grant*, Tex. Civ. App., 2 S. W. 2d 285; *Herskovits v. Irwin*, 299 Pa. 155, 149 A. 195, 197, 198; *Lower Merion Tp. v. Frankel*, 358 Pa. 430, 57 A. 2d 900, 901; *Trans-Oceanic Oil Corp. v. City of Santa Barbara*, 85 Cal. App. 2d 776, 194 P. 2d 148; *Dobbins v. City of Los Angeles*, 195 U. S. 223, 239, 25 S. Ct. 18, 49 L. Ed. 169; *Western Theological Seminary v. City of Evanston*, 325 Ill. 511, 156 N. E. 778, 783; *General Baking Cc. v. Board of Street Commissioners*, 242 Mass. 194, 136 N. E. 245.

We hold that at the time of the adoption of the zoning regulations, on January 2, 1945, this property was affected by a nonconforming use; that the purpose for which the property has been devoted since then to the present

time has not changed, and it is still affected by a non-conforming use. The use was never changed to a higher classification, and a permit from the Zoning Commissioner to continue such use was not required. *Dorman v. Mayor and City Council of Baltimore,* 187 Md. 678, at page 680, 51 A. 2d 658. The classification of the property by Mr. Timanus, in 1944, was nugatory, for the reason that at that time there was no zoning regulations in Baltimore County. This conclusion requires the reversal of the degree, and it is unnecessary to consider other questions raised in the case.

It is contended by the appellants that the appellees have no right to proceed in equity in this case; that the proper procedure was provided by the zoning regulations. Mr. Timanus zoned this property from a residential use area to a commercial use area, which we hold nugatory. Thereafter Zoning Commissioner Doing approved an addition to this building, for light manufacturing, and the Buildings Engineer issued a permit to build this addition. The appellees contend that Mr. Doing, before approving a permit for light manufacturing should have advertised the matter and held a hearing, as provided by the zoning regulations, that the permit is void, and work done under it is done in violation of the zoning regulations.

Chapter 247 of the Acts of 1941 provides: "The County Commissioners, the Zoning Commissioner and the Board of Zoning Appeals, or any if them, or any person whose property is affected by any violation, including abutting and adjacent property owners, whether specially damaged or not, may maintain an action in the Circuit Court for Baltimore County for an injunction enjoining the erection, construction, reconstruction, alteration, repair or use of buildings, structures and land in violation of regulations and restrictions adopted pursuant to this Act."

We think, under the terms of the enabling act quoted and the circumstances in this case, that the chancellor below had jurisdiction to hear and determine this case,

and the appeal from the decree entered below should not be dismissed.

*Motion to dismiss overruled; decree reversed, with costs to appellants, and bill dismissed.*