719 A.2d 1007

**MAYOR & CITY COUNCIL OF BALTIMORE**

v.

**DEMBO, INC.**

**No. 105, Sept. Term, 1998.**

Court of Special Appeals of Maryland.

Oct. 29, 1998.

528

Sandra R. Gutman, Associate Solicitor (Frank C. Derr, Deputy City Solicitor on the brief), Baltimore, for appellant.

Stephen L. Prevas (Peter A. Prevas and Prevas and Prevas on the brief), Baltimore, for appellee.

Argued before SALMON and ADKINS, JJ., and PAUL E. ALPERT, Judge (retired), Specially Assigned.

ADKINS, Judge.

This case arises out of Baltimore City's efforts to regulate the operation of adult entertainment businesses, and presents two questions involving the application of such regulations to a business qualifying as a nonconforming use. The City of

Baltimore (the City) appeals from a decision of the Circuit Court for Baltimore City holding that 1) Dembo, Inc. (Dembo), appellee, did not abandon its nonconforming use by failing for two years to apply for a license to operate an adult entertainment business, and 2) the City's licensing requirements were not applicable to Dembo because it qualified as a nonconforming use. Dembo acquired nonconforming use status because it operated a business involving partially nude dancing prior to the enactment of an ordinance prohibiting such business activity in a B–3 zone and requiring the licensing of all such businesses. We hold that the circuit court was correct in concluding that Dembo did not abandon its nonconforming use by failing to apply for a license, but erred in its order that Dembo was exempt from the licensing provisions of the ordinance.[1]

## LEGAL AND FACTUAL BACKGROUND

Baltimore City Ordinance No. 443 (the Ordinance), enacted on December 15, 1994, regulates the use of "adult entertainment" businesses, "where persons appear in a state of total or partial nudity."[2] The Mayor and City Council, in the Ordinance, expressed concern for the secondary effects upon citizens' health and safety which have been found to flow from the operation of adult entertainment businesses.

Dembo's business, known as the "Gentlemen's Gold Club" (the Gold Club), is located in leased premises at 5801 Pulaski Highway, in a B–3 zoning district. Prior to enactment of the Ordinance, there was no use known as "adult entertainment,"

---

**1.** The parties and the circuit court refer to Dembo as the entity to be licensed. Technically, the ordinance requires licensing of the person who is the owner and operator of the adult entertainment business. The owner and operator of Dembo is Donald Dembo. Because in this case there is no issue that requires a distinction between the corporation, Dembo, Inc., and the individual, Donald Dembo, we shall for convenience include Donald Dembo within the term Dembo, and refer to Dembo in the singular neuter.

**2.** Ordinance No. 443 originated as Bill No. 773, which repealed and reordained with amendments Ordinance No. 258.

and Dembo's operations, which included partially nude danc-
ing, were a permitted use in a B–3 district as a "tavern,
including live entertainment and dancing." Dembo operated
the Gold Club under a use and occupancy permit issued July
29, 1992.

 The Ordinance defines "adult entertainment" and
"adult entertainment business" and makes the operation of an
adult entertainment business in a B–3 district unlawful, except
as a nonconforming use.[3] *See* Baltimore City Code, Art. 30,
§§ 13.0–2, 8.0–6(L). A lawful nonconforming use is estab-
lished if a property owner can demonstrate that before and at
the time of adoption of the zoning ordinance, he was using his
land in a then-lawful manner for a use which by later legisla-
tion became non-permitted. *See Lone v. Montgomery County*,
85 Md.App. 477, 496, 584 A.2d 142 (1991). Dembo's business
qualified as a nonconforming use upon enactment of the
Ordinance.

The Ordinance also required that all existing adult enter-
tainment businesses obtain a permit to operate as such, and
that such permits "shall be issued upon payment of fees, and
shall expire on June 30, 1995." Baltimore City Code, Art. 30,
§ 11.0–8. By Ordinance 443, the permit requirement was
modified to be a requirement for a "license." *Id.* at § 11.0–
8(a).

On January 16, 1995, the Commissioner of the Baltimore
City Department of Housing and Community Development
(the DHCD) sent a letter to owners of adult entertainment
businesses, including Dembo, which explained the licensing
requirements of the new Ordinance. He advised that under
the Ordinance, owners of businesses, including those qualify-
ing as nonconforming uses, were required to apply to the
DHCD for a license to operate an adult entertainment busi-
ness. Businesses qualifying as nonconforming uses were giv-
en until June 1995 to comply with the Ordinance. Dembo,

---

**3.** Section 8.0–6(L) allowed adult entertainment in a B–5 district by
special exception. *See* Baltimore City Code, Art. 30, § 8.06(L).

although aware of the requirement, did not apply for such license.

At a meeting between adult entertainment establishment operators and the DHCD, other operators questioned why Dembo did not have a license. In response, the Baltimore City Zoning Administrator immediately sent inspectors to the Gold Club, and on December 4, 1996, issued a violation notice that required adult entertainment activities be discontinued.[4] Two days later, Dembo filed a Notice of Appeal to the Baltimore Board of Municipal and Zoning Appeals (the Board) requesting a permit to use the premises as a tavern with live entertainment and dancing, including adult entertainment. The Zoning Administrator considered the appeal to be a request by Dembo for a license,[5] but denied its request on grounds that it was no longer eligible for a license as a nonconforming adult entertainment business in a B–3 zone. The Zoning Administrator reasoned that Dembo's failure to apply for a license for over a year rendered its adult entertainment business illegal, and the illegal operation constituted an abandonment of its lawful nonconforming use status.

At the hearing before the Board, there was testimony from several witnesses that from 1989 to 1995 there had been adult entertainment[6] at the Gold Club. The Board impliedly found that prior to the enactment of the Ordinance, Dembo was engaged in an adult entertainment business. On appeal, the parties agree that Dembo was engaged in an adult entertainment business prior to the enactment date of the Ordinance.

The Board also found that Dembo knew about the provisions of the Ordinance, and knew that it was operating an

---

4. The violation notice was issued to Gus and Marlene Glava, owners of the property on which Dembo operated the Gold Club.

5. Dembo does not consider the application to be one for a license, but rather, contends it is not subject to the licensing requirements.

6. When we refer to "adult entertainment" activity occurring prior to the Ordinance, we mean activities involving "total or partial nudity" later defined in the Ordinance as "adult entertainment."

adult entertainment business for which it should have obtained a license. It found that no lawful nonconforming use existed for operation of an adult entertainment business, apparently because it considered that, without a license, Dembo's operations were illegal. It denied Dembo's request to use the premises for adult entertainment because it "would be injurious and affect the general welfare and morals of the community."

The circuit court reversed the Board in an oral opinion, followed by a written order. It found that Dembo "has established a valid, lawful, non-conforming use," which was not terminated by Dembo's failure to obtain a permit for adult entertainment. The court directed the City to issue a certificate of occupancy to Dembo "to use the premises for a tavern with live entertainment, dancing, and adult entertainment." It further ordered that the Ordinance requirement that a license be obtained to operate an adult entertainment business was unenforceable as to Dembo because of its prior nonconforming use.

## DISCUSSION

In our review of this administrative decision, our role is "essentially to repeat the task of the circuit court. . . ." *Mortimer v. Howard Research and Dev. Corp.*, 83 Md.App. 432, 442, 575 A.2d 750 (1990). "In reviewing a decision of an administrative agency, both circuit courts and appellate courts employ the substantial evidence test." *Kade v. Charles H. Hickey Sch.*, 80 Md.App. 721, 725, 566 A.2d 148 (1989). "The scope of review is limited to whether a reasoning mind reasonably could have reached the factual conclusion the agency reached." *Id.* (quoting *Baltimore Lutheran High Sch. Ass'n, Inc. v. Employment Security Admin.*, 302 Md. 649, 662, 490 A.2d 701 (1985)). "A reviewing court, however, always has the right to determine if the administrative body made an error of law." *Id.* (quoting *Baltimore Lutheran*, 302 Md. at 662, 490 A.2d 701). In this case, as we discuss below, it was an error of law that marred the decision of the Board.

■ We find that appellant, appellee, and the Board all failed to recognize the distinction between the municipal power to zone and the separate municipal power to license. The parties improperly merge these separate concepts in their analysis of the rules pertaining to nonconforming uses. We consider the distinction between these concepts to be critical, and hold that a property owner will not lose its nonconforming use status accorded under zoning laws simply by its failure to comply with a licensing law. We agree, however, with appellant's contention that even if a property owner retains its right to a nonconforming use, it is nonetheless required to comply with subsequently enacted licensing provisions regulating such use.

### Zoning and Licensing: Different Municipal Functions

As indicated, the distinction between the municipal powers to zone and to license is critical to our analysis. The underlying nature and purpose of these two distinct types of regulation were well delineated by the Supreme Court of Nevada in *Primm v. City of Reno,* 70 Nev. 7, 252 P.2d 835 (1953), which explained:

Regulation of land use through zoning has become desirable in urban communities in order that a reasonable and orderly segregation of residential, commercial and industrial areas be had. Such regulation is primarily concerned with uniformity of land use and stability of community growth. It is general and comprehensive in scope and the considerations which govern it are, accordingly, general and comprehensive. Regulation of certain types of businesses through discretionary licensing is made necessary by the fact that the inherent character of those businesses is such that without regulation they might be so operated as to become nuisances. Such regulation is primarily concerned with proper operation or with limitation or distribution or outright suppression of operation. It is special and limited in scope and governed by consideration of the circumstances applying, at the time application is made, to the particular

business under consideration, the person applying and the location proposed.

*Id.* at 839 (citations omitted). The difference between zoning and licensing has also been explained by characterizing a zoning ordinance as one which involves "a comprehensive or master plan for dividing the community into zones where specified uses are permitted," as compared with licensing law which "is directed at one particular activity no matter where in the town it is carried out." *Maybee v. Town of Newfield,* 789 F.Supp. 86, 89–90 (N.D.N.Y.1992). Put more simply, licensing "regulates establishments based on the type of business they conduct," and zoning regulates them "based on their location." *City of Batavia v. Allen,* 218 Ill.App.3d 545, 161 Ill.Dec. 239, 578 N.E.2d 597, 599 (1991).

As we turn our attention to the Ordinance in question, it becomes clear that the portion that provides that adult entertainment businesses can only be located in a B–5 district, excluding such businesses in a B–3 district, constitutes an exercise of the City's zoning power because it defines where adult entertainment businesses can be located. On the other hand, the sections that set up a licensing requirement for the operation of adult entertainment are not zoning in nature; rather they exercise a different aspect of the City's police power to regulate the health, safety, and welfare of its population.[7] The preliminary recitals, which are revealing as to the non-zoning aspects of the Ordinance, include the following:

WHEREAS, There are in the City of Baltimore certain adult entertainment businesses that require special supervision and regulation in order to protect the health, safety, and welfare of the customers of the businesses and the citizens of the City of Baltimore; and

---

7. Both the power to zone and the power to license are derived from the police power of the State. *See* Peter W. Salsich, Jr., *Land Use Regulation* § 1.02 (1991) (regarding zoning); *Linkus v. Maryland State Board of HVAC and Refrigeration Contractors,* 114 Md.App. 262, 272–73, 689 A.2d 1254 (1997) (regarding licensing). Such powers can be delegated by the state to municipalities. *See Gino's, Inc. v. Mayor of Baltimore,* 250 Md. 621, 639, 244 A.2d 218 (1968).

WHEREAS, the Mayor and City Council of Baltimore finds that these adult entertainment businesses are frequently used for unlawful sexual activities which can result in sexually transmitted diseases that threaten the health and, in the case, of the AIDS virus, the lives of citizens; and

WHEREAS, a reasonable permitting scheme is a valid and legitimate means of insuring that operators of adult entertainment businesses do not allow their establishments to be used as places detrimental to the health and welfare of the citizens of the City of Baltimore . . . .

Baltimore City Ordinance No. 258. The Ordinance then proceeds to create the classification of "adult entertainment business," which includes a business "where persons appear in a state of total or partial nudity." Baltimore City Code, Art. 30, § 13.0–2.

Even those businesses qualifying as nonconforming uses are required under section 11.0–8 of the Ordinance to obtain a license to conduct such business. This section provides that those businesses with nonconforming use status "shall be issued" a license that is valid until June 30, 1995, upon payment of the licensing fee. *See id.* at § 11.0–8(b)(1). With respect to new businesses seeking to operate with adult entertainment, the Commissioner of the DHCD is directed to "investigate the character and qualifications" of the applicant for such license, and limit licenses to those persons ascertained to be of "good moral character." *Id.* at § 11.0–8(b)(2). In making the determination of "good moral character," the Commissioner "shall consider (1) all criminal convictions of the applicant, and (2) the business history of the applicant." *Id.*

The recited purposes of the Ordinance set forth above, as well as the substance of the licensing provisions for adult entertainment businesses, clearly demonstrate that these licensing provisions are not in the nature of a zoning law, which is primarily concerned with uniformity of land use and stability of location. *See Maybee,* 789 F.Supp. at 89–90; *City of Batavia,* 161 Ill.Dec. 239, 578 N.E.2d at 599; *Primm,* 252 P.2d at 839. Rather, the provisions are more broadly aimed to

protect the health and welfare of the citizens by licensing operators of adult entertainment establishments. Accordingly, in our analysis, we separately consider 1) the rights that Dembo acquired by virtue of its status as a nonconforming adult entertainment business under zoning laws, and 2) how the licensing provisions of the Ordinance interact with such zoning nonconforming use status.

## I.

### Forfeiture of Nonconforming Use

 Appellant contends the circuit court erred when it ruled that Dembo had a lawful nonconforming use, and asserts that Dembo's nonconforming use was legally "abandoned" when it failed to apply for a license to operate an adult entertainment business after passage of the Ordinance. Appellant argues that while a pre-existing nonconforming use may constitute a vested right, Dembo's use of the property without the required license for two years resulted in a termination of its once lawful nonconforming use. It is this argument that exhibits appellant's failure to recognize the difference between the power to license and the power to zone, and the consequences of such difference. We start our discussion of this issue with a brief review of the law of nonconforming use.

### The Law Governing Nonconforming Use

One of the earliest Maryland cases discussing the right of a property owner with a legal use to continue that use after passage of a new zoning ordinance making the use non-permissible is *Amereihn v. Kotras,* 194 Md. 591, 71 A.2d 865 (1950). In *Amereihn,* the Court of Appeals explained the rationale for recognizing nonconforming uses as follows:

> If a property is used for a factory, and thereafter the neighborhood in which it is located is zoned residential, if such regulations applied to the factory it would cease to exist, and the zoning regulation would have the effect of confiscating such property and destroying a vested right therein of the owner. Manifestly this cannot be done,

because it would amount to a confiscation of the property, and nonconforming use is a vested right and entitled to constitutional protection.

*Id.* at 601, 71 A.2d 865. Since 1950, Maryland courts have developed and refined the law regarding the respective rights of zoning authorities and owners of properties qualifying as nonconforming uses. *See, e.g. Board of Zoning Appeals v. Meyer,* 207 Md. 389, 114 A.2d 626 (1955) (holding that when a property owner at time of adoption of last comprehensive zoning was using land for use which by new legislative action became non-permitted, the owner has a lawful nonconforming use); *County Comm'rs v. Zent,* 86 Md.App. 745, 587 A.2d 1205 (1991) (explaining permissible intensification of nonconforming use as compared to impermissible "extension"); *McKemy v. Baltimore County,* 39 Md.App. 257, 269–70, 385 A.2d 96 (1978) (defining four factors to determine whether current activity is within the scope of nonconforming use).

It has simultaneously been recognized, however, that the fundamental problem facing zoning is the inability to eliminate the nonconforming use. *See Grant v. Mayor of Baltimore,* 212 Md. 301, 308, 129 A.2d 363 (1957). Thus, a primary goal of zoning law has been "to reduce nonconformance to conformance as speedily as possible with due regard to the legitimate interests of all concerned." *Id.* at 307, 129 A.2d 363; *see also County Comm'rs v. Uhler,* 78 Md.App. 140, 149, 552 A.2d 942 (1989). With this goal in mind, the courts have sanctioned reasonable methods to limit the duration of a nonconforming use. One of these methods is to require termination of the use over a reasonable period of time, a method known as "amortization." *See Grant,* 212 Md. at 315–316, 129 A.2d 363; *Lone,* 85 Md.App. at 498, 584 A.2d 142. The justification for termination of nonconforming uses by amortization was explained by the Court of Appeals in *Stevens v. City of Salisbury,* 240 Md. 556, 214 A.2d 775 (1965):

True amortization provisions almost if not universally call for a termination of non-conforming uses after the lapse of a reasonable, specified period in order that the owner may amortize his investment (the reasonableness of the period

depends upon the nature of the non-conforming use, the structures thereon, and the investment therein). . . .

*Id.* at 570–71, 214 A.2d 775. An ordinance is not arbitrary and unconstitutional on its face if it reveals a reasonable relationship between the amortization period and the nature of the nonconforming use. *See Gough v. Board of Zoning Appeals,* 21 Md.App. 697, 704–07, 321 A.2d 315 (1974).

▇▇▇ Another judicially approved method for zoning authorities to limit duration of a nonconforming use is to require that it terminates if legally abandoned for a specified period of time. *See id.* at 704–05, 321 A.2d 315. Abandonment does not depend upon the landowner's intent, but upon whether the property owner failed to use the property for the time period specified in the zoning ordinance that defines abandonment. *See Catonsville Nursing Home, Inc. v. Loveman,* 349 Md. 560, 581–82, 709 A.2d 749 (1998); *Canada's Tavern, Inc. v. Town of Glen Echo,* 260 Md. 206, 209–11, 271 A.2d 664 (1970).

Unlike the present case, the Maryland cases discussing abandonment of a nonconforming use have all involved instances in which the operation of the nonconforming use had ceased for some period of time after passage of the new ordinance. *See* Stanley D. Abrams, *Guide to Maryland Zoning Decisions* § 11.4, at 374–82 (3d ed.1992) (discussing Maryland cases). Neither party has cited, nor has this Court found, any Maryland cases addressing the issue of whether failure to apply for a license to conduct the business that constitutes a lawful nonconforming use amounts to abandonment of the nonconforming use status. Appellant cites *Meyer* to support his argument. The *Meyer* decision, however, does not even address the issue of abandonment. Rather, it affirmed the decision of a zoning board to grant a permit to a nonconforming business to build a 120–foot addition to its building. *See Meyer,* 207 Md. at 401, 114 A.2d 626.

A number of cases outside of Maryland have considered the issue and the majority have rejected contentions similar to those advanced by the City, *i.e.,* that a nonconforming use is abandoned by the failure to obtain a license pursuant to a licensing ordinance enacted after establishment of the legal

non-conforming use. *See, e.g., Beugnot v. Coweta County,* 231 Ga.App. 715, 500 S.E.2d 28, 33 (1998); *Carroll v. Hurst,* 103 Ill.App.3d 984, 59 Ill.Dec. 587, 431 N.E.2d 1344, 1348 (1982) (holding nonconforming use status is not lost by failure to obtain license to operate an automobile junkyard under a statute intended to prevent the easy disposal of stolen vehicles); *Board of Zoning Appeals v. Leisz,* 686 N.E.2d 935, 938 (Ind.Ct.App.1997) (stating that nonconforming use status is not lost by failure to register nonconforming rental unit with occupancy by more than three unrelated adults); *Trailer City, Inc. v. Board of Adjustment,* 218 N.W.2d 645, 648 (Iowa 1974) (explaining that nonconforming use remains valid for operation of trailer park regardless of failure to renew license); *Dempsey v. Newport Bd. of Adjustments,* 941 S.W.2d 483, 486 (Ky.Ct.App.1997) (holding nonconforming use is not abandoned by failure to renew occupational license to use site as automotive parts repair center and garage); *City of Middlesboro Planning Comm'n v. Howard,* 551 S.W.2d 556, 557 (Ky.1977) (stating that the licensing privilege bore no reasonable relationship to the zoning laws, and the penalty of forfeiture of the right to operate a nonconforming used car lot "is so disparate to the ordinary penalty ... so as to render it void as discriminatory and arbitrary"); *Derby Ref. Co. v. City of Chelsea,* 407 Mass. 703, 555 N.E.2d 534, 539 (1990) (stating that "a valid nonconforming use is not rendered unlawful by failure to possess requisite governmental approval, provided that such approval can be easily obtained"); *Board of Selectmen v. Monson,* 355 Mass. 715, 247 N.E.2d 364, 365 (1969) (holding nonconforming use is not lost by failure to obtain license to store trailers); *Scavone v. Mayor of Totowa,* 49 N.J.Super. 423, 140 A.2d 238, 240 (App.Div.1958) (explaining that failure to maintain motor vehicle dealer's license did not invalidate nonconforming use of property for used auto business); *Rubin v. Wallace,* 63 A.D.2d 763, 404 N.Y.S.2d 733, 734–35 (1978) (explaining that failure to register certificate of compliance as required for nonconforming uses did not effect forfeiture of nonconforming status); *Henning v. Goldman,* 8 Misc.2d 228, 169 N.Y.S.2d 817, 819 (Sup.1957) (holding nonconforming use status is not lost by failure to renew license to

operate parking lot); *City of Franklin v. Gerovac,* 55 Wis.2d 51, 197 N.W.2d 772, 774 (1972) (holding lack of license for salvage yard did not invalidate nonconforming use status). *See also* Kenneth H. Young, *Anderson's American Law of Zoning* § 618 (4th ed.1995). *But see Pushnik v. Hempfield Township,* 43 Pa.Cmwlth. 332, 402 A.2d 318, 320 (1979) (holding nonconforming use forfeited for failure to obtain license to operate junkyard); *Town of Scituate v. O'Rourke,* 103 R.I. 499, 239 A.2d 176, 180 (1968) (holding failure to obtain required license prior to zoning prevented acquiring nonconforming use for junkyard); *In re Chamberlin,* 134 Vt. 359, 360 A.2d 100, 101–02 (1976) *(* holding junkyard owner who did not procure license for fifteen years lost nonconforming use status*); Town of Wilson v. Kunstmann,* 7 Wis.2d 387, 96 N.W.2d 709, 712 (1959) (holding nonconforming use is forfeited for failure to obtain a permit to park a trailer outside of a trailer park).

We shall follow the majority of jurisdictions and apply the rule that a valid nonconforming use will not be forfeited by the failure of the business owner to secure a license to operate his business. We consider that this rule accords reasonable protection to the property right that has been long recognized under Maryland law as a vested right subject to constitutional protection. *See Amereihn,* 194 Md. at 601, 71 A.2d 865. It also reflects and maintains the distinction between the municipal power to zone and the municipal power to regulate by licensing. On the other hand, such rule does not unduly restrict a municipality's legitimate goal to regulate business to protect the health and welfare of its citizens. As discussed below, the City retains the right to subject nonconforming uses to later police power regulations governing the manner or operation of use.

## II.

### Application of Licensing Requirement to Nonconforming Use Business

The City complains that the circuit court's decision to hold Dembo exempt from the licensing requirement of the

Ordinance is discriminatory and prejudices the City's attempt to regulate adult entertainment on a uniform basis as to all operators. It contends that such decision constitutes an arbitrary abuse of discretion because it singles out Dembo as exempt, without any explanation or justification for such preferential treatment as compared with other owners of adult entertainment businesses. We do not view the circuit court's decision as an abuse of discretion because the decision was not discretionary in nature. We agree, however, with the City's contention that Dembo, as a nonconforming operator of an adult entertainment business, does not stand exempt from the City's requirement that all adult entertainment businesses be licensed. Again, proper analysis of the issue requires recognition of the distinction between zoning and licensing.

Neither party has cited, nor have we found, any Maryland case regarding the issue of whether nonconforming uses are subject to subsequently enacted licensing requirements. The issue has received considerable attention in other states, however, and the majority rule follows the view that a nonconforming use business acquires no exemption from subsequently enacted licensing requirements, provided such requirements do not effectively preclude continuation of the business. The Supreme Court of Washington, sitting *en banc*, recently explained:

> Courts have consistently recognized that nonconforming uses are subject to subsequently enacted reasonable police power regulations. Only where the regulation would immediately terminate the nonconforming use have courts found the regulation to be invalid as applied to the nonconforming use. These rulings are consistent with the principle that a nonconforming use has a "vested" or "protected" right to continue....

*Rhod–A–Zalea & 35th, Inc. v. Snohomish County*, 136 Wash.2d 1, 959 P.2d 1024, 1029 (1998) (en banc). The court went on to explain that, as a policy matter, to hold nonconforming uses exempt from later enacted health and safety regulations "would not be in the public interest and ... would be devastating to the community's land use planning." *Id.* at

1032. It also reasoned that "such an exemption would give those nonconforming uses an undeserved and substantial competitive advantage against their 'conforming' competitors who are required to comply." *Id.; accord Goldblatt v. Town of Hempstead,* 369 U.S. 590, 82 S.Ct. 987, 8 L.Ed.2d 130, (1962); *Watanabe v. City of Phoenix,* 140 Ariz. 575, 683 P.2d 1177 (App.1984); *Dock Watch Hollow Quarry Pit, Inc. v. Township of Warren,* 142 N.J.Super. 103, 361 A.2d 12 (App.Div.1976), *aff'd,* 74 N.J. 312, 377 A.2d 1201 (1977); *Miller & Son Paving, Inc. v. Wrightstown Township,* 42 Pa.Cmwlth. 458, 401 A.2d 392 (1979); *see also* 4 Ziegler, *Rathkopf's The Law of Zoning and Planning,* § 51A.02 (4th ed. Rev.1978, Release 39). We agree with the rationale articulated by the Supreme Court of Washington, and we think that such a rule creates the appropriate balance between the right of the property owner to continue his nonconforming use, as discussed in Section I, and the rights of the government to adopt and enforce uniform regulations pursuant to its police power. Accordingly, we hold that Dembo is subject to reasonable licensing requirements, even though they were enacted subsequent to its acquisition of its nonconforming use.

## III.

### Constitutional Challenge To Ordinance

Appellee in its brief challenges the validity of the Ordinance on constitutional First Amendment grounds. It contends, *inter alia,* that the licensing scheme contained in the Ordinance fails to impose adequate decision-making standards, and therefore constitutes an improper prior restraint on protected speech (adult entertainment in the form of nude dancing). Appellee also contends that the procedure established by the Ordinance whereby a licensee is entitled to renewal of his license unless there is objection by ten neighboring property owners constitutes a violation of due process. These arguments were not raised by appellee at the Board level. This failure is not necessarily fatal to their preservation. *See Insurance Comm'r v. Equitable Life Assurance Soc'y,* 339 Md. 596, 621, 664 A.2d 862 (1995). But appellee also failed to

raise them at the circuit court level. Although some concerns about whether the Ordinance *on its face* could withstand a challenge on First Amendment grounds were raised by the circuit court *sua sponte* during closing argument and discussed by the court in its oral opinion, the court later clarified its oral opinion to negate any holding as to whether the Ordinance is void on its face on constitutional grounds. Accordingly, because these issues were not raised or decided by the lower court, they will not be decided at this time by this Court. *See Hall v. State,* 22 Md.App. 240, 245–46, 323 A.2d 435 (1974); *Woodell v. State,* 2 Md.App. 433, 439, 234 A.2d 890 (1967); Md. Rule 8–131 (explaining that ordinarily the appellate court will not decide an issue unless it plainly appears to have been decided below).

## CONCLUSION

For these reasons, we affirm the circuit court's holding that Dembo's nonconforming use status was not abandoned by its failure to apply for a license. We reverse the circuit court's holding that the licensing provisions of the Ordinance cannot be applied to Dembo. We hold that Dembo retains its vested nonconforming use status to operate a business with adult entertainment, and the City retains the police power to regulate Dembo to the extent that such regulation does not *unreasonably* deprive Dembo of its practical ability to operate. *See Rhod–A–Zalea,* 959 P.2d at 1030. This means that Dembo has the right to apply for a license to operate an adult entertainment business, and the City has the right to pursue any available enforcement remedies against Dembo if it declines to apply for a license or pay the fees therefore. In such enforcement proceedings, Dembo would have the right to raise any defenses that may exist, including those based on the First Amendment, due process, or other constitutional grounds, that are not inconsistent with this Opinion.

**THE CIRCUIT COURT FOR BALTIMORE CITY IS AFFIRMED IN PART AND REVERSED IN PART; CASE IS REMANDED TO THE CIRCUIT COURT FOR BALTIMORE CITY WITH INSTRUCTIONS TO REMAND TO**

BALTIMORE BOARD OF MUNICIPAL AND ZONING APPEALS FOR FURTHER PROCEEDINGS CONSISTENT WITH THIS OPINION.

COSTS TO BE PAID ONE–HALF BY APPELLANT AND ONE–HALF BY APPELLEE.