Hillsborough-southern judicial district
No. 2007-784

DOUGLAS R. GUY, JR.

v.

TOWN OF TEMPLE

Argued: June 18, 2008
Opinion Issued: August 21, 2008

*Matthew W. Glavey*, of New Ipswich, on the brief and orally for the petitioner.

*Drescher & Dokmo, P.A.*, of Milford (*Dwight D. Sowerby* on the brief and orally), for the respondent.

DUGGAN, J. The petitioner, Douglas R. Guy, appeals an order of the Superior Court (*Hampsey*, J.) upholding the Temple Zoning Board of Adjustment's (ZBA) denial of his application for a junkyard license. *See generally* RSA 236:110-:129 (1993 & Supp. 2007). We reverse and remand.

The trial court found or the record supports the following facts. Guy owns property in Temple, upon which he operates an automotive repair, body work, and junkyard business (the property). A commercial enterprise of the same nature has existed on the property since before 1972 and possibly as early as the 1960s. Guy has operated the junkyard for approximately the last twenty years.

In 1972, the Town of Temple (Town) adopted a comprehensive zoning ordinance, which mandated that all "[m]otor vehicle junkyards . . . abide by the state laws on this subject . . . ." At that time, the state law on the subject, RSA chapter 267-A (1966), required owners of established junkyards to, among other things, submit an application containing various information regarding the junkyard's location to "the legislative body" of the town where the junkyard was located. RSA 267-A:13 (1966). Upon receipt of that application, the statute provided that "the legislative body shall issue [the junkyard] owner a license valid" for one year. *Id.* The Town's zoning ordinance also provided that "[a]ny lawful use of land or buildings or parts thereof at the time of the adoption of this ordinance may be continued indefinitely, although such use does not conform to the provisions of this ordinance . . . ."

In 1999, Guy filed an application with the Temple Board of Selectmen (Board), requesting both a license to conduct state automobile inspections and certification that he was in compliance with local zoning laws. After the Board denied his application, Guy appealed to the ZBA. On October 12, 1999, the ZBA issued an order reversing the Board's denial of "grandfathered/non-conforming status to [Guy]'s automotive-related activities on" the property, which included the following findings of fact:

1. A commercial enterprise including auto repair/junkyard/ auto body work/garage, public [*sic*] existed at [the property] prior to the adoption of the Temple Zoning Ordinance in 1972.

2. Said activities have continued since then through the present.

. . . .

4. New testimony, documents, and photographs presented at the rehearing reinforced the applicant's original contention and evidence that a grandfathered use existed at said premises.

5. The junkyard phase of the commercial enterprise is subject to state licensing and regulation.

Based upon these findings, the ZBA concluded that Guy's "commercial enterprise is a grandfathered/non-conforming use and is therefore protected under the Temple Zoning Ordinance and under New Hampshire RSA 674:19." Neither party appealed this order.

On August 2, 2001, the Board sent Guy a letter enclosing "an initial application, per [his] request, for a motor vehicle junkyard permit," as well as "a copy of RSA 236:11 through 236:129 pertaining to junk yards." In the letter, the Board requested that he "complete the application and return it with the $25.00 fee." The Board also advised him that by signing the application he would be "affirming that [he] me[t] all the provisions of the State of NH RSA's." Guy asserts that he never received this correspondence.

There were no further communications between the parties regarding the junkyard until 2006, when Guy applied for a vehicle dealer license. The Board responded on March 8, 2006, informing him that his "request for dealer plates constituted an expansion of [his] non-conforming use." The same day, Guy contested the Board's determination and submitted a copy of the 1999 ZBA decision in support of his position.

Shortly thereafter, Guy, for the first time, filed an application for a junkyard license with the Board. The application form required Guy to "affirm that [his] junkyard . . . is in compliance with all the requirements of RSA 236:123, and all other provisions of RSA 236 relative to junkyards." Furthermore, in filing the application, Guy was required to affirm that he had "received confirmation of 'Grandfathered' status from the" ZBA and had "not moved, expanded or . or enlarged [his junkyard] to occupy more area than [his] original site plan."

On April 19, 2006, the Board sent Guy a letter denying his requests for a vehicle dealer license and a junkyard license. With respect to the vehicle

dealer license, the Board found that the selling of motor vehicles was an expansion of his non-conforming use and, thus, Guy needed "to file for a special exception." As to the junkyard license, the Board stated:

> The 1999 ZBA decision to "grandfather" your auto repair business included a requirement that you bring your junkyard into compliance with Temple's Zoning ordinance and State statutes (RSA 236). The Board . . . subsequently wrote to you reminding you of this ZBA requirement and attached copies of the relevant State statutes. To date you have not complied; you are therefore in violation of both Temple's Zoning ordinance and State of NH RSA's.
>
> We are now in receipt of your application for a junkyard license which the [Board is] unable to approve because you are in violation of the above referenced Temple Zoning ordinance and State Statutes.
>
> Please schedule an appointment to meet with the [Board] to discuss your plan to comply with the State's junkyard statutes and thereby the requirement of the 1999 ZBA decision to "grandfather" your auto repair business.

After receiving this letter, Guy appealed the Board's "determination that his application for motor vehicle dealer plates constituted an expansion of a nonconforming use requiring a special exception" to the ZBA. The ZBA scheduled a hearing on the matter for July 6, 2006.

On May 23, 2006, the Board issued a notice of violation, ordering Guy to "cease and desist any and all activities on [his property] consisting of the creation, establishment and/or maintenance of a junkyard." (Emphasis omitted.) In support thereof, the Board stated that Guy had failed to obtain a license and demonstrate his compliance with the requirements for a junkyard in RSA 236:111 through RSA 236:129, as required by both the 1999 ZBA decision and New Hampshire law. Moreover, the Board asserted that Guy's junkyard "ha[d] been expanded, without benefit of permit or license," since the 1999 ZBA decision. Therefore, the Board found that Guy had "not taken the steps required under the applicable statute[s] to protect [his] vested right to continue [his] junkyard operation" and, as provided by RSA 236:119 (Supp. 2007), the junkyard constituted a nuisance. Accordingly, the Board declared that, in order to continue operation of his junkyard, Guy had to comply with the application requirements for a new junkyard as provided in RSA 236:115 (Supp. 2007).

On June 23, 2006, the Board sent Guy another letter, stating that it was "declin[ing] to entertain [his] permit request." The Board explained that, as

already indicated in the notice of violation, it was of the opinion "that the junkyard operation referred to in the 1999 ZBA decision is no longer a permitted non-conforming use for reason of [Guy's] failure to comply with the applicable State Statutes in a timely fashion." Because Guy had lost his non-conforming status, and a junkyard is not a permitted use in the Town, the Board concluded that Guy was required to obtain a special exception, subject to any applicable historic district commission oversight, in order to continue his junkyard operation. After the Board denied his motion for reconsideration, Guy appealed the Board's April 19, 2006 and May 23, 2006 decisions to the ZBA.

The ZBA held a public hearing on the matter on October 5, 2006. At that hearing, the Town contended, among other things, "that the junkyard, if it ever enjoyed a grandfathered status, has now lost it . . . [because] the junkyard has not complied with either state statute or the 1999 ZBA decision." In addition, the Town argued that the junkyard had been expanded since 1999 into an area that was designated on the tax rolls as current use property. *See generally* RSA 79-A:1 (2003). Guy, in contrast, asserted that he had actually contracted, rather than expanded, the number and location of cars on the property since 1999. He further argued that the 1999 decision vested non-conforming status upon his junkyard that could not be stripped away for failing to pay a license fee and, even if it could, the Town did not have an application process in place until 2001 at the earliest. At the same time, however, Guy's counsel submitted licensing records of the only other junkyard in Temple, which indicated that that junkyard had submitted applications for the years 1993, 2000, 2003, 2004, 2005 and 2006.

After listening to the parties' arguments, the ZBA entered closed session to discuss the matter. As indicated in the ZBA's minutes, during the ensuing discussion the ZBA members "spent a lot of time talking about where cars are located . . . and how many there are as well as where they were located in 1999 and how many there were then." ZBA member Don Kraemer, who was on the ZBA in 1999, also told the rest of the members that the only issue in 1999 was whether Guy's property could "be grandfathered so he could have an inspection station." He stated that the "the junkyard wasn't an issue at that time" and that it was his opinion that the ZBA members had "simply noted that [Guy] needed to get the junkyard licensed" in the 1999 decision. Finally, the ZBA "members noted that RSA 236:125 came into being in 1966, so if there was a junkyard that was grandfathered in 1999, it was an illegal one because it wasn't licensed." Ultimately, the ZBA affirmed the Board's decision on the following basis:

The applicant's junkyard has, at least since 1999, been operated in an unlawful fashion. Therefore, based on the language of the

Temple Zoning Ordinance that a non-conforming use refers to a lawful use, the use is not grandfathered. The applicant does not have an allowable non-conforming use by the definition in the Temple Zoning Ordinance.

After the ZBA denied his motion for rehearing, Guy appealed to the superior court. On October 10, 2007, the court ruled:

The 1999 decision did not "grandfather" [Guy]'s usage of the property for a junkyard operation because the decision states that the junkyard is subject to state law and licensing requirements. State law requiring junkyard licensure has existed since 1965. . . . There is no indication that any junkyard on the property has ever been licensed. Even if the ZBA, in the 1999 decision, had determined that [Guy]'s junkyard was a valid nonconforming use, it would have been incorrect, given that nonconforming uses must be lawful. Because [Guy]'s junkyard was not licensed under state law in 1972, it could not be lawful. . . . Further, the record indicates that on August 2, 2001, the Board sent [Guy] a letter enclosing an application for a junkyard license, further suggesting that the 1999 decision did not license [Guy]'s junkyard. . . .

The trial court then rejected the majority of Guy's arguments based, in substantial part, upon its interpretation of the 1999 decision. In addition, the trial court ruled that Guy had failed to: (1) present any evidence to support his claim that the Town did not have a formal junkyard licensing process; (2) show that the Town's alleged delay in enforcing the licensing requirements was unreasonable, or that he suffered prejudice as a result, such as to make the doctrine of laches applicable; and (3) articulate sufficient support for his claim that the Board "violated his constitutional right of due process, resulting in an unconstitutional taking of his property."

On appeal, Guy asserts that the trial court committed reversible error by: (1) "finding that the 1999 decision . . . did not determine [his] motor vehicle junkyard to be a valid nonconforming use"; (2) "finding [his] junkyard unlawful because it was not properly licensed"; (3) "rejecting [his] claim that the [T]own . . . did not have a formal licensing process in effect in 1999, and to the extent that the [T]own ever implemented a procedure thereafter, such process was sporadically enforced up to the time enforcement action was taken"; (4) "failing to apply the doctrines of collateral estoppel and laches"; (5) "rejecting [his] contention that the provisions of RSA 236:125 and related case law required the . . . [Board] to issue [him] a motor vehicle junkyard license in 2006"; and (6) "rejecting [his] claim that the Board's failure to issue [him] a junkyard license in 2006, or afford [him]

a hearing thereon, breached [its] obligation to [him] under state law, unreasonably interfered with [his] occupation, [and] violated [his] constitutional right of due process resulting in an unconstitutional taking of [his] property."

Our review of zoning board decisions is limited. *Harrington v. Town of Warner*, 152 N.H. 74, 77 (2005). We will uphold the trial court's decision unless the evidence does not support it or it is legally erroneous. *Chester Rod & Gun Club v. Town of Chester*, 152 N.H. 577, 580 (2005). For its part, the trial court must treat all factual findings of the ZBA as *prima facie* lawful and reasonable. *Id.*; *see* RSA 677:6 (2008). It may set aside a ZBA decision if it finds by the balance of probabilities, based upon the evidence before it, that the ZBA's decision was unreasonable. *Town of Chester*, 152 N.H. at 580. However, the interpretation of a tribunal's order presents a question of law, which we review *de novo*. *See In re Guardianship of Luong*, 157 N.H. 429, 438 (2008). With these principles in mind, we turn to Guy's arguments.

## I

Guy argues first that, despite the trial court's findings to the contrary, the ZBA expressly found that his junkyard was a valid nonconforming use in the 1999 decision. Because the Town failed to appeal the ZBA's decision, Guy contends that the trial court erred in questioning the validity of the ZBA's determinations therein. We agree.

In the 1999 decision, the ZBA broadly stated that it was reversing the Board's denial of "grandfathered/non-conforming status to [Guy]'s automotive-related activities on" the property. Nowhere in the decision is this expansive holding qualified in such a way as to exclude the junkyard. To the contrary, the ZBA clarified that Guy's "*commercial enterprise* includ[ed] auto repair/*junkyard*/auto body work/garage" activities and that that "*commercial enterprise* is a grandfathered/non-conforming use." (Emphases added.) Indeed, the very sentence relied upon by the trial court in concluding that "the 1999 decision did not 'grandfather' [Guy]'s usage of the property for a junkyard operation," again references the junkyard as a "phase of the *commercial enterprise*" in question. (Emphasis added.) That the 1999 decision also noted that "[t]he junkyard . . . is subject to state licensing and regulation," in no way alters the fact that the ZBA clearly envisioned the junkyard as a component of the commercial enterprise that it found to be "a grandfathered/non-conforming use."

The Town argues that the ZBA was nevertheless precluded "from legally ruling that the [junkyard] was grandfathered because" the junkyard was not licensed and "[t]he law is well established that a nonconforming use is permissible only where it legally exists at the date of the adoption of the

zoning ordinance." Thus, the Town argues, any finding in the 1999 decision that the junkyard was a valid nonconforming use is invalid and must be overturned.

■ Even assuming the Town is correct that the ZBA so erred, to entertain such an assertion would invariably require us to revisit the substance of the 1999 decision. To do so here, where, as indicated above, the issue has already been resolved and the order was not appealed, would run afoul of the doctrine of collateral estoppel. *See, e.g., Grossman v. Murray*, 141 N.H. 265, 269 (1996) ("In its most basic formulation, the doctrine of collateral estoppel bars a party to a prior action, or a person in privity with such a party, from relitigating any issue or fact actually litigated and determined in the prior action." (quotation omitted)). We therefore agree with Guy that the doctrine of collateral estoppel bars consideration of this claim. Accordingly, we accept the findings in the 1999 decision and hold that Guy's junkyard has been determined to be a valid nonconforming use.

## II

■ Having determined that the 1999 decision established that the junkyard was a valid nonconforming use, we must now assess whether the junkyard was subsequently divested of that status. As we have previously explained:

> The right to maintain nonconforming uses is meant to protect property owners from a retrospective application of zoning ordinances, so that property owners may continue using and enjoying their property when their uses were lawful prior to the enactment of a zoning ordinance. RSA 674:19 protects that right by providing that zoning ordinances shall not apply to existing structures or uses, thereby creating a vested right to continue the prior lawful use of land. Because the general policy of zoning law, however, is to carefully limit the extension and enlargement of nonconforming uses, we strictly construe provisions that permit the continuance of such uses, and the party asserting that a proposed use is not new or impermissible bears the burden of proof. Therefore, an extension and enlargement that substantially changes the nature and purpose of the nonconforming use is impermissible.

*Town of Salem v. Wickson*, 146 N.H. 328, 330 (2001) (quotations omitted); *see also* D. MANDELKER, LAND USE LAW § 5.79, at 5-75 (5th ed. 2003) (explaining that "[a]n ordinance prohibiting a change in a nonconforming use is not a taking of property").

In this case, the Town's zoning ordinance bars "substantial[] expan[sion] or enlarge[ment]" of a nonconforming use and states that a nonconforming

use can be lost if the use is "discontinued for two years" or "superseded by a conforming use." The Town argues first that the junkyard is no longer a valid nonconforming use because Guy failed to comply with state law, including the requirement that he "obtain a state license under RSA 236:114." Guy concedes that he has not obtained a license for his junkyard since the 1999 decision was issued, but asserts that his junkyard nevertheless maintains its nonconforming status because: (1) the Town did not have a formal licensing procedure in place; and (2) the failure to obtain a license does not obviate nonconforming use status because such failure "can be easily remedied by payment of any back licensing fees."

██ Resolution of Guy's first argument requires little discussion. The only evidence he has provided in support of his contention that the Town did not have a formal licensing process indicates that the other junkyard in the Town submitted license applications in, at least, 1993, 2000, 2003, 2004, 2005 and 2006. This evidence supports, rather than contradicts, a finding that the Town had a licensing scheme in place during the pertinent years. It was, therefore, not unreasonable for the ZBA and the trial court to conclude that Guy failed to provide sufficient evidence to prove this claim. *Town of Chester*, 152 N.H. at 580; *Malachy Glen Assocs. v. Town of Chichester*, 155 N.H. 102, 105 (2007) ("The party seeking to set aside the ZBA decision bears the burden of proof . . . ." (quotation omitted)).

Guy's second argument raises a more complex question; namely, whether a valid nonconforming use can be divested for an owner's failure to comply with a licensing statute. Although we have not before been faced with this precise issue, the majority of courts that have considered the matter have held that the failure to obtain a license does not terminate a valid nonconforming use "because the power to license is distinct from the power to zone." D. MANDELKER, *supra* § 5.81, at 5-81 to -82; *see Carroll v. Hurst*, 431 N.E.2d 1344, 1347-8 (Ill. App. Ct. 1982) (finding nonconforming use despite property owner's failure to obtain license to operate his junkyard where the statute sought to prevent disposal of stolen vehicles); *Trailer City, Inc. v. Board of Adjustment*, 218 N.W.2d 645, 648 (Iowa 1974) (explaining how a mobile home park maintains its nonconforming status despite owner's failure to renew license); *Dempsey v. Newport Bd. of Adjustments*, 941 S.W.2d 483, 486 (Ky. Ct. App. 1997) (holding that an automotive repair center did not lose its nonconforming use because of failure of prior owner to renew occupation license); *Baltimore v. Dembo*, 719 A.2d 1007, 1011 (Md. Ct. Spec. App. 1998) (holding "that a property owner will not lose its nonconforming use status accorded under zoning laws simply by its failure to comply with a licensing law"); *Board of Selectmen of Wrentham v. Monson*, 247 N.E.2d 364, 365 (Mass. 1969)

(holding that mobile home park's nonconforming use status was "not destroyed . . . by any failure to comply with local or State licensing provisions where the defect . . . can be easily remedied"); *Hooper v. City of St. Paul*, 353 N.W.2d 138, 141 (Minn. 1984) ("Violations of ordinances unrelated to land use planning do not render the type of use unlawful."); *Costa v. Callahan*, 840 N.Y.S.2d 163, 166-67 (App. Div. 2007) (holding that a junkyard owner's failure to obtain a license to operate "did not disqualify the sites from nonconforming use status as junkyards"); *Stephentown Concerned Cit. v. Herrick*, 676 N.Y.S.2d 246, 248 (App. Div. 1998) (gravel pit owner did not lose nonconforming status by failing to maintain a valid mining permit), *appeal dismissed in part, denied in part*, 756 N.E.2d 72 (N.Y. 2001); *City of Franklin v. Gerovac*, 197 N.W.2d 772, 773-74 (Wis. 1972) (finding that property owner's failure to obtain license for his salvage yard did not invalidate his nonconforming use).

██ Like these courts, we are cognizant of the fact that, unlike zoning law which "is primarily concerned with uniformity of land use and stability of community growth," licensing regulations are generally "concerned with proper operation or with limitation or distribution or outright suppression of operation." *Primm v. City of Reno*, 252 P.2d 835, 839 (Nev. 1953). In other words, licensing laws typically "regulate[] establishments based on the type of business they conduct, and zoning [laws] regulate[] them based on their location." *Dembo*, 719 A.2d at 1011 (quotations omitted). As a result, "the failure to obtain a license does not render the use unlawful in the sense intended by zoning ordinances which preserve existing lawful uses." *Costa*, 840 N.Y.S.2d at 166 (quotation and emphasis omitted). For these reasons, we agree with the majority of courts that the failure to obtain a license designed to regulate an activity will not adversely affect the previously determined nonconforming status of the land upon which such an activity is being conducted.

Because the rule is founded upon the distinction between zoning and licensing laws, however, the rationale supporting its application weakens when the licensing scheme offended "so meaningfully curtail[s] the use to which land may be employed . . . as to be deemed the equivalent of an ordinance which regulates the utilization of land." *Town of Scituate v. O'Rourke*, 239 A.2d 176, 180 (R.I. 1968); *cf. In re Chamberlin*, 360 A.2d 100, 101-02 (Vt. 1976). For instance, in *O'Rourke*, a junkyard owner had failed to obtain a license pursuant to an ordinance that required a licensed junkyard to be, among other things, "a specific distance from a state highway or school" and "more than 300 feet from any park, bathing beach, school, church or cemetery." *O'Rourke*, 239 A.2d at 180. After determining that the licensing regulation controlled the use of land "to such an extent . . . that it

could well be designated as a quasi-zoning ordinance," the court held that the junkyard owners' "failure to comply with the requirements of the [ordinance] . . . preclude[d] them from acquiring the protective status of a valid nonconforming use." *Id.*

Although *O'Rourke* is distinguishable to the extent that it involved a junkyard that had not yet been deemed a nonconforming use, it is at least conceivable that a licensing scheme could be so closely aligned with zoning regulations that failure to comply with its terms might rise to the level of an abandonment of a pre-existing nonconforming use. *Cf. Pushnik v. Hempfield Tp.*, 402 A.2d 318, 320 (Pa. Commw. Ct. 1979). Determination of whether Guy's failure to obtain a license will affect the nonconforming use status of his junkyard therefore requires analysis of the applicable licensing law. *See* RSA 236:111-:129.

When interpreting the language of a statute, we ascribe the plain and ordinary meaning to the words used and discern the legislative intent from the statute as written. *State v. Doyle*, 156 N.H. 306, 308 (2007). We will not consider what the legislature might have said, or add language that the legislature did not see fit to include. *Id.* When the language of a statute is plain and unambiguous, we do not look beyond it for further indication of legislative intent. *Franklin v. Town of Newport*, 151 N.H. 508, 509 (2004). However, we are the final arbiters of the legislature's intent as it is expressed in the words of a statute when considered as a whole. *Doyle*, 156 N.H. at 308.

In this case, the junkyard licensing statute was "adopted under the police power of the state to conserve and safeguard the public safety, health, morals, and welfare, and to further the economic growth and stability of the people of the state through encouragement to the development of the tourist industry within the state." RSA 236:111 (Supp. 2007). To achieve this end, the statute prohibits an individual from operating, establishing, or maintaining a junkyard without first obtaining "a license to operate a junk yard business" and "a certificate of approval for the location of the junk yard." RSA 236:114 (1993). The statute provides two distinct processes for obtaining the required license: one for junkyards established after the date of passage of the subdivision (new junkyards), *see* RSA 236:114-:118, :120, :121 (1993 & Supp. 2007), and one for junkyards "already established" on that date (established junkyards), *see* RSA 236:125 (1993). The trial court ruled that the date of "passage of the subdivision" is April 20, 1981. Because neither party has directly challenged this ruling in their briefs, we accept it for purposes of resolving this case.

With regard to junkyards established after the date of "passage of the subdivision," the owner is required to apply "in writing to the local governing body of the municipality where it is proposed to locate the junk

yard" in order to obtain a license. RSA 236:115 (Supp. 2007). In that application, the owner must provide "[a] description of the land to be included within the junk yard" and "[c]ertification of compliance with best management practices [as] established by the department of environmental services." *Id.* In determining whether to grant or deny the application, the legislative body is required to consider "the suitability of the applicant with reference to his ability to comply with the fencing requirements [under RSA 236:123 (1993)] or other reasonable regulations concerning the proposed junk yard . . . , to any record of convictions for any type of larceny or receiving stolen goods . . . ." RSA 236:117 (1993).

In addition, as in *O'Rourke*, the licensing process for new junkyards contains certain location requirements. *See O'Rourke*, 239 A.2d at 180. For instance, prior to granting a license the legislative body is required to consider whether there are "natural or artificial barriers protecting the junk yard . . . from view." RSA 236:120 (1993). Moreover, the statute also commands that:

> In passing upon the application, . . . [the local governing body] shall take into account the nature and development of surrounding property, such as the proximity of churches, schools, hospitals, public buildings or other places of public gatherings; and whether or not the use of that proposed location can be reasonably prevented from affecting the public health, safety, or morals by reason of offensive or unhealthy odors or smoke, or of other causes. In no case may a license be granted for a new junk yard or automotive recycling yard located less than 660 feet from the right-of-way lines of class I, class II, class III or class III-a highways or located less than 300 feet from the right-of-way lines of class IV, class V and class VI highways.

RSA 236:118 (1993).

■ The process for obtaining a license for an "established" junkyard, in contrast, is less exacting. This is largely because, "[f]or the purposes of [the junkyard licensing statute,] the location of junk yards . . . already established are considered approved by the local governing body of the municipality where located and the owner of the yard considered suitable for the issuance of a license." RSA 236:125. By deeming the location of established junkyards "approved by the local governing body," RSA 236:125 effectively renders the location and aesthetic requirements that are imposed upon the approval of a license for a new junkyard inapplicable to existing junkyards. With those considerations out of the equation, all that the statute requires for approval of a license for an established junkyard is: (1) the payment of a license fee, RSA 236:122 (Supp. 2007); (2) the

submission to the local governing body of "the information as to location which is required in an application," RSA 236:125; (3) compliance with certain fencing requirements, RSA 236:123, :125; (4) "certification of compliance with best management practices [as] established by the department of environmental services for the automobile salvage industry," RSA 236:121, II (Supp. 2007); (5) that the applicant has not been "convicted of any type of larceny or of receiving stolen goods," *id.*; and (6) that "the junkyard [has] not become a public nuisance," *id.* Unlike the regulation in *O'Rourke*, each of these requirements is concerned with the "proper operation" of junkyards, and not "uniformity of land use and stability of community growth." *Primm*, 252 P.2d at 839. As a result, the law governing the licensing of established junkyards is a pure licensing scheme.

The Town does not dispute that Guy's junkyard was already established on the date of "passage of the subdivision." *See* RSA 236:125. Nevertheless, the Town argues that Guy is subject to the more stringent licensing procedure for a new junkyard because he failed to "furnish the local governing body the information as to location which is required in an application," as mandated by RSA 236:125. Moreover, the Town contends that the licensing process for new junkyards is quasi-zoning and, thus, Guy's failure to obtain a license pursuant to that licensing scheme has divested him of his nonconforming use status.

■ We need not pass upon whether the licensing process for new junkyards is a "quasi-zoning" statute, *O'Rourke*, 239 A.2d at 180, because we disagree with the Town that the licensing process for established junkyards provided in RSA 236:125 is inapplicable in this case. To be sure, as the Town notes, the second sentence of RSA 236:125 states: "Within 60 days from the passage of this subdivision, however, the owner shall furnish the local governing body the information as to location which is required in an application, together with the license fee . . . ." But nothing in that language suggests that the remedy for failure to submit such an application is to subject established junkyards to the licensing process for new junkyards. Instead, that sentence simply imposes another restriction on established junkyards and, as with all other requirements in the statute, the failure to comply opens the junkyard owner to potential liability for a penalty, *see* RSA 236:127 (1999), and gives the Town the right to "initiate proceedings" to, among other things, seek a "mandatory injunction to end the violation," RSA 236:128 (Supp. 2007). Accordingly, because RSA 236:125 is applicable in this case, we hold that Guy's failure to obtain a license does not divest his junkyard of its status as a nonconforming use. *Cf. Carroll*, 431 N.E.2d at 1348.

The Town also argues that Guy lost whatever right to a nonconforming use he may have had by unlawfully expanding his use "onto a lot that was not previously part of the operation." As noted above, the Town's zoning ordinance bars "substantial[] expan[sion] or enlarge[ment]" of a nonconforming use. *See also* RSA 236:124 (1993) (expressly permitting the adoption of local ordinances for the control of junk yards and explaining that such "ordinances shall control when in conflict with" the state law). However, while the minutes of the 2006 ZBA hearing mention that the ZBA members "spent a lot of time talking about where cars are located . . . and how many there are" in the junkyard, as noted by the trial court, "[t]he 2006 ZBA findings of fact make no mention of any *finding* that [Guy] unlawfully expanded his junkyard operations." (Emphasis added.) We are therefore unable to ascertain whether the ZBA actually determined that Guy had expanded his nonconforming use, *see Kalil v. Town of Dummer Zoning Bd. of Adjustment*, 155 N.H. 307, 310-11 (2007) (finding remand to the ZBA appropriate where the superior court "intended to vacate and remand the matter because it found the text of the [ZBA] decision unclear"), let alone the character, nature, scope or effect on the surrounding neighborhood of the purported expansion, *see Wickson*, 146 N.H. at 331; *Town of Hampton v. Brust*, 122 N.H. 463, 469 (1982) ("where there is no substantial change in the use's effect on the neighborhood, the landowner will be allowed to increase the volume, intensity or frequency of the nonconforming use"). Accordingly, we must remand this issue for proceedings consistent with this opinion.

## III

Guy argues next that the trial court erred in "rejecting [his] contention that the provisions of RSA 236:125 and related case law required the . . . [Board] to issue [him] a motor vehicle junkyard license in 2006." Although it is unclear, there appear to be two separate components to Guy's argument on this issue. First, he argues that "the ZBA assumed the licensing authority vested in the Board" when it held in 1999 that his junkyard was a nonconforming use. Second, he asserts that the Town was required to issue him a license because RSA 236:125 states that upon payment of "the license fee . . . the local governing body *shall* issue a license" to all "already established" junkyards. (Emphasis added.) We disagree with both arguments.

■■ To the extent that Guy is arguing that he is entitled to a license by mere virtue of the ZBA's 1999 decision grandfathering his junkyard, he is in error. *See, e.g., Dembo*, 719 A.2d at 1015 (holding that a landowner who has obtained nonconforming use status is still required to obtain a license to operate a business and comply with "later police power regulations

governing the manner or operation of use" of the property); *Costa*, 840 N.Y.S.2d at 167 (explaining that nonconforming uses "remain[] obligated to comply—in all respects—with other applicable laws and ordinances"). Nonconforming use status does not confer upon its holder an unfettered right to operate in circumvention of licensing laws. As already discussed at length above, the power to zone and to license are "distinct powers that do not conflict with each other." *Willow Creek Ranch v. Town of Shelby*, 611 N.W.2d 693, 700 (Wis. 2000). Therefore,

> [a] zoning ordinance is not in its legal effect like a license or legislative sanction to carry on in a district every kind of business that may not be expressly excluded therefrom, and if there are reasons apart from the zoning law why the business may not legally be carried on in the district, the zoning law . . . furnishes no protection to it.

*Marshall v. Holbrook*, 177 N.E. 504, 506 (Mass. 1931).

Nor do we agree that RSA 236:125 required the Town to issue Guy a license. Guy's argument on this point ignores the express language of the statute. Although it states that upon payment of "the license fee . . . the local governing body *shall* issue [the applicant] a license," (emphasis added), RSA 236:125 also explicitly provides that the owner of an established junkyard must "furnish the local governing body the information as to location which is required in an application" and "comply with all other provisions of this subdivision including the fencing requirements set forth in RSA 236:123." Guy must therefore comply with all of the requirements in the licensing statute in order to obtain a license to operate his junkyard, as well as a renewal of such license. *See* RSA 236:121, II (providing that "[l]icenses shall be renewed . . . upon payment of the annual license fee without a hearing, if all provisions of this subdivision are complied with during the license period"). The only case cited by Guy in support of this argument, *Greene v. Town of Deering*, 151 N.H. 795 (2005), is inapposite and we decline to further address it.

## IV

Guy's remaining contention is that the trial court erred by "rejecting [his] claim that the Board's failure to issue [him] a junkyard license in 2006, or afford [him] a hearing thereon, breached [its] obligation to [him] under state law, unreasonably interfered with [his] occupation, [and] violated [his] constitutional right of due process resulting in an unconstitutional taking of [his] property." Lingering within this sweeping assertion—and the mere paragraph of argument that follows in his brief—are elements of a

procedural due process claim, a substantive due process claim, and a takings claim. However, as stated by the trial court below, Guy has failed to "clarify whether he is arguing that his substantive or procedural due process rights were violated" and to sufficiently develop any of these arguments. As we have repeatedly stated, "[j]udicial review is not warranted for complaints regarding adverse rulings without developed legal argument, and neither passing reference to constitutional claims nor off-hand invocations of constitutional rights without support by legal argument or authority warrants extended consideration." *Appeal of Omega Entm't*, 156 N.H. 282, 287 (2007); *State v. Chick*, 141 N.H. 503, 504 (1996) (explaining that a mere passing reference to a constitutional claim renders the argument waived); *Keenan v. Fearon*, 130 N.H. 494, 499 (1988) (stating that "off-hand invocations" of constitutional rights supported by neither argument nor authority warrant no extended consideration). We therefore decline to address this argument further. The remaining arguments presented in this appeal are without merit and do not warrant further discussion. *Vogel v. Vogel*, 137 N.H. 321, 322 (1993).

*Reversed and remanded.*

BRODERICK, C.J., and DALIANIS, GALWAY and HICKS, JJ., concurred.